UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEONTAE CHARLES FAISON BY AND
THROUGH HIS GUARDIAN AD LITEM
THERESA FLORES,

        Plaintiff,

    v.

JONATHAN KNEA, et al.,

        Defendants.

Case No. 24-cv-06059-JSC

**ORDER RE: DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Re: Dkt. No. 101

Plaintiff sues the East Bay Regional Parks District ("EBRPD") and EBRPD Officer Jonathan Knea for violating his civil rights under federal and state laws. (Dkt. No. 52.)[1] Now pending before the Court is EBRPD's and Officer Knea's motion for summary judgment. (Dkt. No. 101.) Having carefully considered the parties' submissions, and with the benefit of oral argument on December 4, 2025, the Court GRANTS summary judgment in favor of Defendants on part of the Fourth Amendment claim, the Fourteenth Amendment claim, and the false imprisonment claim, and DENIES summary judgment on the remainder of the Fourth Amendment claim, the *Monell* claim, and the negligence, battery, and Bane Act claims.

As to Plaintiff's Fourth Amendment excessive force claim, although reasonable jurors could find Officer Knea's first two tases violated Plaintiff's constitutional rights, he is entitled to qualified immunity. However, factual disputes prevent the Court from ruling Officer Knea did not violate Plaintiff's clearly established rights by tasing him three times in or near the water. As to Plaintiff's Fourteenth Amendment state-created danger claim, reasonable jurors could find Officer

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1    Knea violated Plaintiff's constitutional rights, but he is entitled to qualified immunity.  As to

2    Plaintiff's *Monell* claim, reasonable jurors could find EBRPD's failure to train officers on using

3    tasers in water amounted to deliberate indifference.  And, as to Plaintiff's state law claims,

4    reasonable jurors could find in Plaintiff's favor except as to his false imprisonment claim.

5                                        **BACKGROUND**

6    **I.      THE APRIL 5, 2024 INCIDENT**

7            **A.      Traffic Stop**

8            EBRPD's jurisdiction includes parks in Alameda and Contra Costa Counties, 55 miles of

9    shoreline, and several reservoirs.  (Dkt. No. 105-23 at 20.)  On April 5, 2024, Officer Knea was

10   tasked with patrolling seven areas, five of which were attached to some form of water.  (Dkt. No.

11   105-28 at 49-51.)  While he was patrolling Martin Luther King Jr. Regional Shoreline, he saw a

12   car parked illegally with expired registration tags.  (Dkt. No. 101-2 ¶¶ 6, 7.)  Officer Knea

13   approached the vehicle, where he saw Plaintiff and a woman on the passenger side, and he

14   explained he was stopping them because the car's registration was expired.  (Dkt. No. 105-1 at

15   0:50-1:35.)  Officer Knea instructed Plaintiff and the woman to walk towards him to the back of

16   the car, which they did.  (*Id.* at 1:05-1:35.)  They stated they did not have identification or

17   weapons on them, and Plaintiff gave Officer Knea a false name.  (*Id.* at 1:35-2:30; Dkt. No. 105-

18   28 at 72.)  Officer Knea later noted Plaintiff's clothing was "loose and bulky," which he believed

19   meant Plaintiff could be carrying a firearm or weapon, but he did not notice any "specific bulge"

20   or otherwise see a weapon.  (Dkt. No. 105-28 at 69-70.)  Officer Knea then requested a cover

21   officer because, as the woman had a black eye, potential domestic violence and the vehicle might

22   have been stolen.  (Dkt. No. 105-1 at 2:30-2:45; Dkt. No. 105-28 at 75; Dkt. No. 101-2 ¶ 11.)

23   Plaintiff returned to the driver's side door of the car to get his identification, but Officer Knea

24   ordered him to return to the rear bumper because he was concerned Plaintiff was attempting to

25   retrieve a weapon from the car.  (Dkt. No. 105-1 at 4:15-4:45.)

26           Officer Knea provided the information he obtained from the woman and Plaintiff to

27   dispatch and waited at his vehicle while Plaintiff and the woman remained at the back of the car.

28   (*Id.* at 5:00-8:00.)  The woman then provided her name, which Officer Knea shared with dispatch.

1   (*Id.* at 9:30-14:00.)  As Officer Galindo arrived in a patrol car, Plaintiff again returned to his

2   driver's side door, but Officer Knea drew his firearm and ordered Plaintiff to return, because he

3   believed Plaintiff was reaching into the car to retrieve a weapon.  (*Id.* at 15:15-15:30; Dkt. No.

4   105-28 at 89-90; Dkt. No. 101-14 at 5.)  Plaintiff turned around with his hands up, then ran away

5   from Officers Knea and Galindo.  (Dkt. No. 105-1 at 15:20-15:40.)

6           **B.        Taser Discharges**

7           Once Plaintiff began running, Defendant Knea holstered his pistol and drew his taser.

8   (Dkt. No. 105-1 at 15:30-15:50; Dkt. No. 105-28 at 93-94.)  Both Officer Knea and Officer

9   Galindo ran after Plaintiff through a field.  (Dkt. No. 105-1 at 15:45-16:10; Dkt. No. 101-2 ¶ 17.)

10  Officer Knea repeatedly told Plaintiff to get down on the ground and warned him he would be

11  tased.  (Dkt. No. 105-1 at 15:30-16:15.)  Officer Knea later noted he did not see any pedestrians,

12  but he believed Plaintiff could have had a gun on him.  (Dkt. No. 105-28 at 93-95.)

13          Officer Knea discharged his taser five times.  (Dkt. No. 101-2 ¶ 19.)  Although Officer

14  Knea believes his first discharge missed, Plaintiff subsequently fell to the ground.  (Dkt. No. 105-

15  28 at 99-100; Dkt. No. 105-4 at 00:45-00:55.)  Plaintiff got up and continued to run toward the

16  water.  (Dkt. No. 105-4 at 00:50-00:55.)  Officer Knea then fired a second taser prong at Plaintiff,

17  and Plaintiff again fell.  (*Id.*; Dkt. No. 105-28 at 101.)  In deposition, Officer Knea stated he

18  believed Plaintiff was "triangulating" him and "trying to [or] getting ready to return fire."  (Dkt.

19  No. 105-28 at 99.)

20          Then, as Plaintiff approached the water, Officer Knea fired his taser a third time and hit

21  Plaintiff's back, but he did not remember Plaintiff responding.  (Dkt. No. 105-4 at 00:50-00:60;

22  Dkt. No. 105-28 at 101-102.)  Plaintiff entered the water, and Officer Knea fired a fourth taser

23  prong, which he believes missed Plaintiff.  (Dkt. No. 105-4 at 00:55-01:05; Dkt. No. 101-2 ¶ 21.)

24  Officer Knea then fired a fifth taser prong into Plaintiff's back, which he has acknowledged

25  "end[ed] up hitting him."  (Dkt. No. 105-4 at 00:55-01:05; Dkt. No. 101-2 ¶ 22; Dkt. No. 105-29

26  at 17.)  Officer Knea heard a prolonged sound from his taser, which he had been trained meant a

27  connection had been made.  (Dkt. No. 105-4 at 01:00-01:12; Dkt. No. 105-28 at 107-109.)

28          Officer Knea and Officer Galindo waded into the water while Plaintiff moved away from

United States District Court
Northern District of California

1    them toward the opposite shoreline.  (Dkt. No. 105-1 at 16:20-17:15; Dkt. No. 101-2 ¶ 28.)  In his

2    deposition, Officer Knea stated Plaintiff reached down into his waistband, which he believed

3    meant Plaintiff might be reaching for a weapon to shoot him.  (Dkt. No. 105-28 at 111-112.)

4    Officer Knea said: "You ain't going to make it dude. You're going to end up drowning."  (Dkt.

5    No. 105-1 at 18:40-18:45.)

6         Officer Knea declares he and Officer Galindo stopped pursuing Plaintiff because the

7    "water had a current" and "was frigid," and "[e]ntering to grab him was unsafe and unreasonable,

8    if not impossible."  (Dkt. No. 101-2 ¶¶ 29-32.)  Later, Defendants' police procedures expert

9    Robert Fonzi opined "[i]f the officers had entered the water to perform a rescue, their safety would

10   have been severely compromised.  Both officers were in full uniform, wearing their safety gear,

11   which weighed approximately 40-50 pounds."  (Dkt. No. 101-22 at 12.)  However, "recognizing a

12   drowning risk – [Officer] Galindo requested medical personnel to stage on the Doolittle side,

13   which was the direction [Plaintiff] was swimming."  (Dkt. No. 101-2 ¶ 33.)  Officer Knea did not

14   at this time report to dispatch he had used his taser.  (Dkt. No. 105-28 at 119, 125.)  Although he

15   did not write a police report on his interactions with Plaintiff, Officer Knea did report to dispatch

16   and speak with other officers at the scene that day, and he did not remember telling either dispatch

17   or the officers at the scene he suspected Plaintiff had a weapon.  (Dkt. No. 105-28 at 125-129.)

18        **C.    Water Rescue and Cardiac Arrest**

19        Deputy Alvarado responded to the other side of the estuary; from his body worn camera,

20   Plaintiff can be seen and heard screaming and calling for help.  (Dkt. No. 105-6 at 00:00-04:00.)

21   From the shore, deputies and officers instructed Plaintiff to keep swimming toward the shore, but

22   he appeared to struggle.  (*Id.*)  One officer yelled to Plaintiff he was swimming against the current,

23   and another officer warned Plaintiff he was going to "drift back out" due to the current.  (*Id.* at

24   04:00-04:20, 7:00-7:40.)  Eventually, officers threw a flotation device in, but because Plaintiff was

25   unresponsive, they brought him out of the water.  (*Id.* at 08:30-09:30.)  When the officers retrieved

26   Plaintiff, there were two taser probes embedded in his sweatshirt.  (Dkt. No. 101-22 at 9.)  On

27   shore, Plaintiff had shallow breathing and remained unresponsive.  (Dkt. No. 105-20 at 4.)  By the

28   time Oakland Fire Paramedics arrived, Plaintiff was pulseless and no longer breathing; Plaintiff

United States District Court
Northern District of California

4

1    had suffered a cardiac arrest.  (*Id.*)  They attempted to treat him.  (*Id.*)

2         Approximately 34 minutes after his initial cardiac arrest, Plaintiff attained "return of

3    spontaneous circulation" and "began to move."  (*Id.* at 4-5.)  Plaintiff's cardiac arrest expert Dr.

4    Donald Schreiber opined Plaintiff's "cardiac arrest was caused by acute respiratory failure

5    associated with drowning and hypothermia," and was not induced by methamphetamine or being

6    tased.  (*Id.* at 7-8.)  He also opined because Plaintiff's "cardiac arrest likely occurred no more than

7    1-2 minutes" before the paramedics arrived, "[i]t is probable that had the Oakland Fire Dept

8    paramedics arrived just a few minutes earlier, [Plaintiff's] cardiac arrest *might* have been

9    prevented."  (*Id.* at 8-9.)  Plaintiff was brought to the Emergency Department at Alameda Hospital

10   before being transferred to a "higher level of care at Highland General Hospital."  (*Id.* at 4, 6.)

11   The hospital's attending nurse stated the two marks on Plaintiff's back "were caused by a taser."

12   (Dkt. No. 105-30 at 2.)

13        "After a prolonged hospital admission, his functional status was poor – bedridden, non-

14   ambulatory, verbally non-communicative with only brainstem functioning, tranch dependency and

15   feeding tube dependent."  (Dkt. No. 105-20 at 7.)  Highland General Hospital discharged him to

16   his sister's home care on July 3, 2024 with a "primary discharge diagnosis [of] anoxic brain

17   injury, in addition to drowning and acute respiratory failure with hypoxia."  (Dkt. No. 105-22 at

18   3.)  Plaintiff's medical expert Dr. John Hixon opines as of August 15, 2025, Plaintiff was

19   "bedbound, nonverbal, and continue[d] to have a tracheostomy and PEG tube," and "exhibit[ed]

20   rare or no purposeful neurologic functions but appear[ed] to have maintained brainstem reflexes."

21   (*Id.* at 3, 5.)  Furthermore, "[g]iven the duration of time since the injury, it is extremely unlikely

22   that he will gain additional function," so "his current care needs will persist throughout his

23   remaining lifespan," which Dr. Hixon estimates will be about 7 years.  (*Id.* at 5-6.)

24   **II.    TASER MECHANICS AND EBRPD TASER TRAINING**

25        **A.    Taser 10 Mechanics**

26        Officer Knea used Axon Enterprises' ("Axon's") Taser 10 on Plaintiff.  (Dkt. No. 105-23

27   at 14.)  On the Taser 10, each trigger pull deploys a single probe, and Officer Knea needed to pull

28   the trigger at least twice to deploy two probes and create a circuit.  (*Id.* at 50-51.)  Once two

United States District Court
Northern District of California

probes attach to a person's skin, they create a circuit, and the taser automatically delivers a five second current of electricity. (*Id.* at 52, 55-58.) The electrical current can cause neuromuscular incapacitation ("NMI"), in which the muscles contract repeatedly and become unusable, but recovery is immediate when the current ends. (*Id.* at 50-51; Dkt. No. 105-26 at 88-89, 91-92.) According to Defendants' non-retained expert Brian Chiles, a senior manager at Axon, a Taser 10 can achieve NMI with an electrical impedance of between 300 and 1000 ohms, assuming "probes strike a person and puncture through their skin and fat tissue and embed into the muscle tissue." (Dkt. No. 105-26 at 7, 25-29.) Based on Officer Knea's taser logs, Mr. Chiles determined the third and fifth probe deployed and made a connection with a circuit that had an impedance of 300-400 ohms for about a quarter of a second. (*Id.* at 46-47.) According to Mr. Chiles, the electric current could have either gone through Plaintiff's muscle or passed only into the water. (*Id.* at 47, 55-56.)

### B.     EBRPD's Taser Training and Policy

According to EBRPD Sergeant Tom Starick, who instructs officers on taser use, Officer Knea was trained to follow EBRPD's Taser Policy. (Dkt. No. 105-23 at 8, 24-25, 33.) EBRPD's Taser Policy permits an officer to use a taser in limited circumstances and conditions:

> 304.5.1 APPLICATION OF THE CED
> The CED may be used, when the circumstances reasonably perceived by the officer at the time indicate that such application reasonably appears necessary to control a person who:
> (a) Is violently resisting.
> (b) Has demonstrated, by words or action, an intention to be violent or to forcibly resist, and reasonably appears to present the potential to harm officers, themselves, or others.
> Mere flight from a pursuing officer, without additional circumstances or factors, is not good cause for the use of the CED to apprehend an individual.
> The CED shall not be used to psychologically torment, to elicit statements, or to punish any individual.

(Dkt. No. 105-24 at 3.) The Taser Policy also warns:

> 304.5.2 SPECIAL DEPLOYMENT CONSIDERATIONS
> The use of the CED on certain individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of using the device. This includes: . . .

United States District Court
Northern District of California

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

(f) Individuals whose position or activity may result in collateral injury (e.g., falls from height, located in water, operating vehicles).

(*Id.* at 3-4.)

Officer Knea completed trainings on conducted-energy weapons, including the Taser 10, on at least four occasions comprising a total of at least 32 hours.  (Dkt. No. 101-2 ¶¶ 38-40; Dkt. No. 101-4 at 3.)  Officer Knea was also trained on Axon's product warnings, which included a warning officers should "avoid using" their taser on a person "located in water, mud or marsh environment," and taser deployment can cause "loss of control from muscle contraction, incapacitation or startle response" and "physiologic or metabolic changes that may increase the risk of death or serious injury."  (Dkt. No. 105-23 at 64-65; Dkt. No. 105-25 at 3-4.)  Sergeant Starick stated officers are also trained to reassess between deployments to ensure that the use of the taser is reasonable upon each deployment.  (Dkt. No. 105-23 at 48-49.)

EBRPD asked Principle Consulting and Investigations LLC to perform an administrative investigation of the incident.  (Dkt. No. 101-25 at 1.)  When interviewed by Ed Schroder, a partner at Principle Consulting and Investigations LLC, Officer Knea said he "understood" Section 304.5.2 "to indicate the policy does not mandate an officer 'shall not' use the TASER in water, rather suggests officers 'should not' deploy the weapon in water."  (*Id.* at 27.)  "He agreed the concern regarding the TASER's usage in water or other situations, like when an individual is in an elevated position, stems from the collateral injuries that can occur (i.e., drowning in water . . .) if the suspect were to fall due to Neuro-Muscular Incapacitation."  (*Id.*)  In addition, in his statement to EBRPD, Officer Knea noted after his fifth tase hit Plaintiff, he "[did not] fire anymore rounds because you're not supposed to fire it while the guy is in the water."  (Dkt. No. 105-29 at 17.)  However, Officer Knea explained he fired the earlier tases because "both he and Officer Galindo were just feet away from the suspect[,] . . . and had the TASER achieved the desired Neuro-Muscular Incapacitation at that point, they would have been in a position to immediately extract him from the water."  (Dkt. No. 101-25 at 63.)  Still, Officer Knea stated "he had never received any training regarding apprehending a fleeing or uncooperative suspect from a body of water."  (*Id.* at 29.)

In addition, Plaintiff's police practices expert, former police lieutenant Travis Norton, opined officers are trained tasers "are an intermediate and significant level of force," but also that "misuse of their less lethal weapons can convert an intermediate use of force to a deadly use of force," and "the misuse of a Taser against someone in a body of water would convert a less lethal weapon and intermediate use of force into a deadly one because causing someone NMI in a body of water is a substantial risk of serious bodily injury or death." (Dkt. No. 105-27 at 5, 44, 50-51.)

## III. PROCEDURAL HISTORY

After an initial complaint, Plaintiff filed an amended complaint suing Alameda County, EBRPD, and Officer Knea. (Dkt. Nos. 1, 20.) The Court granted EBRPD's motion to dismiss the *Monell* claims against it with leave to amend. (Dkt. Nos. 27, 36.) In the second amended complaint, Plaintiff sues (1) Officer Knea for Fourth Amendment violations under 42 U.S.C. § 1983; (2) EBRPD under *Monell* and § 1983; (3) Officer Knea, EBRPD, and Alameda County for Bane Act violations, Cal. Civ. Code § 52.1; (4) Officer Knea, EBRPD, and Alameda County for battery; (5) Officer Knea, EBRPD, and Alameda County for negligence; (6) Officer Knea, EBRPD, and Alameda County for false imprisonment; and (7) Officer Knea for Fourteenth Amendment violations under § 1983. (Dkt. No. 52.) EBRPD moved to dismiss the *Monell* claims against it, and the Court denied its motion. (Dkt. Nos. 48, 76.) The Court then granted Alameda County's motion for judgment on the pleadings as to all claims against it. (Dkt. Nos. 63, 84.) The Court also denied Plaintiff's motion for leave to file a third amended complaint. (Dkt. Nos. 66, 84.) EBRPD and Officer Knea now move for summary judgment on all claims against them. (Dkt. No. 101.)

## DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56. The moving party bears the initial burden of demonstrating the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he burden then moves to the opposing party, who must present significant probative evidence tending to support its claim." *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952

8

1   F.2d 1551, 1558 (9th Cir. 1991) (quotation marks and citation omitted).  In ruling on a motion for

2   summary judgment, the Court must "view the evidence presented through the prism of the

3   substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

4   "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in

5   his favor." *Id.* at 255.  "Credibility determinations, the weighing of the evidence, and the drawing

6   of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a

7   motion for summary judgment." *Id.*  Ultimately, "[s]ummary judgment is inappropriate if

8   reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in

9   the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir.

10  2008) (citation omitted).

11  **I.     CAUSATION**

12          Defendants first seek summary judgment on all Plaintiff's claims because, according to

13  Defendants, no reasonable juror could find Officer Knea's tasing caused Plaintiff's cardiac arrest

14  or drowning.

15          To succeed on a section 1983 claim, "the plaintiff must [] demonstrate that the defendant's

16  conduct was the actionable cause of the claimed injury," which requires "establish[ing] both

17  causation-in-fact and proximate causation." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026

18  (9th Cir. 2008) (citations omitted) (discussing Fourth Amendment claim); *see also Spencer v.

19  Peters*, 857 F.3d 789, 798 (9th Cir. 2017) (requiring cause in fact and proximate cause for

20  Fourteenth Amendment claim); *cf. Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)

21  (requiring official policy, practice, or custom be "moving force" behind the constitutional

22  violation).  Negligence, battery, and false imprisonment claims similarly require a plaintiff to

23  prove the defendant's conduct caused his injuries.  *See People v. Trout-Lacy*, 43 Cal. App. 5th

24  369, 372 (2019) (for negligence, requiring showing the defendant's conduct was a substantial

25  factor in and proximately caused injuries); *A.B. v. Cnty. of San Diego*, 112 Cal. App. 5th 404, 416

26  (2025) (for battery, requiring showing the defendant's intentional act caused "harmful or offensive

27  conduct [which] caused injury, damage, loss or harm to plaintiff" (quotation marks and citation

28  omitted)); *Gibson v. J.C. Penney Co.*, 165 Cal. App. 2d 640, 646 (1958) (allowing recovery for

United States District Court
Northern District of California

9

1    "all detriment proximately caused" by false imprisonment).

2         Defendants are not entitled to summary judgment because there is evidence from which

3    reasonable jurors could find Officer Knea's tasing caused at least some injury to Plaintiff.  There

4    is evidence at least one of Officer Knea's taser deployments hit Plaintiff.  Plaintiff's attending

5    nurse also stated two marks on Plaintiff's back "were caused by a taser."  (Dkt. No. 105-30 at 2.)

6    And, because Sargent Starick and Mr. Chiles noted the Taser 10 probes are "designed to leave

7    with more velocity from the device," in order to "penetrate skin and fat tissue into muscle," jurors

8    could reasonably infer the taser probes hit and bruised Plaintiff, even if they did not send an

9    electric current.  (Dkt. No. 105-23 at 58; Dkt. No. 105-26 at 73.)  Because reasonable jurors could

10   find Officer Knea's tasing Plaintiff injured him by at least causing the two marks on his back,

11   Defendants are not entitled to summary judgment on causation grounds.  *See also Headwaters*

12   *Forest Defense v. Cnty. of Humbolt*, 240 F.3d 1185, 1199 (9th Cir. 2000) ("We expressly rejected

13   the . . . requirement that a plaintiff show 'significant injury' to establish an excessive force claim

14   under the Fourth Amendment." (citing *Wilks v. Reyes*, 5 F.3d 412, 416 (9th Cir. 1993))), *vacated*

15   *on other grounds*, 534 U.S. 801 (2001).

16        As to Defendants' argument no reasonable juror could find Officer Knea's tasing caused

17   Plaintiff's cardiac arrest or drowning, Defendants confirmed at oral argument they did not move

18   for partial summary judgment on that specific issue.  The Court recognizes it has discretion to

19   "enter an order stating any material fact—including an item of damages or other relief—that is not

20   genuinely in dispute and treating the fact as established in the case."  *See* Fed. R. Civ. P. 56(g); *cf.*

21   *Steeped, Inc. v. Nuzee, Inc.*, No. 19-CV-03763-HSG, 2020 WL 6891832, at *2 (N.D. Cal. Nov. 24,

22   2020) (explaining court's "broad discretion to refrain from granting [such] relief"); Advisory

23   Comm. Notes on Fed. R. Civ. P. 56(g) ("Even if the Court believes that a fact is not genuinely in

24   dispute it may refrain from ordering that the fact be treated as established.").  But even if the issue

25   whether Officer Knea's tasing caused Plaintiff's cardiac arrest or drowning was undisputed, the

26   Court declines to exercise its discretion to treat the factual issue as established under Federal Rule

27   of Civil Procedure 56(g).  Plaintiff opposed Defendants' causation summary judgment motion

28   because Defendants moved for full judgment on all of Plaintiff's claims and are not entitled to

United States District Court
Northern District of California

10

1   such judgment because the record supports a finding Officer Knea "caused *some* injury." (Dkt.

2   No. 107 at 32.) As explained above, Plaintiffs are correct.

3       In addition, reasonable jurors could find Officer Knea's tasing caused Plaintiff's cardiac

4   arrest and drowning. Drawing inferences in Plaintiff's favor, at least Officer Knea's third and fifth

5   taser deployments hit Plaintiff and should have created a circuit through which the Taser 10 could

6   have sent an electrical current through Plaintiff and caused NMI. Mr. Chiles confirmed the taser

7   logs suggest a connection had been made between the third and fifth taser deployments, the taser

8   delivered an electrical pulse between 300 and 400 ohms, and the pulse may have travelled through

9   Plaintiff's muscle tissue. Especially given Axon's warnings to avoid tasing someone in the water

10  because tasing "may cause loss of control from muscle contraction, incapacitation or startle

11  response" or "physiologic or metabolic changes that may increase the risk of death or serious

12  injury," reasonable jurors could conclude Officer Knea's tasing Plaintiff in the water "disoriented,

13  exhausted, injured and scared" him, which caused him to become lost in a current and

14  subsequently drown. (Dkt. No. 105-25 at 3-4; Dkt. No. 107 at 33.)

15      Defendants' arguments to the contrary are unavailing. As an initial matter, Officer Knea's

16  and Officer Galindo's statements they did not witness Plaintiff's NMI are not dispositive. *See*

17  *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) ("[W]e cannot simply accept what

18  may be a self-serving account by the police officer . . . [b]ecause the person most likely to rebut

19  the officers' version of events . . . can't testify." (cleaned up)). And, because reasonable jurors

20  could conclude Officer Knea's tasing caused Plaintiff to be swept out by a current, Defendants'

21  expert opinions Plaintiff's cardiac arrest, drowning, and current condition were caused by the

22  prolonged time he spent in the water are not dispositive.

23      Defendants also argue Plaintiff chose to enter the water, thus breaking any chain of

24  causation between Officer Knea's taser discharges and Plaintiff's injuries. *See Sabbe v.*

25  *Washington Cnty. Bd. of Comm'rs*, 84 F.4th 807, 817 (9th Cir. 2023) ("Where the injury was

26  actually brought about by a later cause of independent origin that was not foreseeable, that

27  superseding cause cuts off the chain of causation." (quotation marks and citation omitted)).

28  However, Officer Knea discharged the taser twice after Plaintiff entered the water and

United States District Court
Northern District of California

11

1   acknowledged at least his last taser deployment hit Plaintiff.  So, Plaintiff's entering the water

2   cannot as a matter of law be a later superseding cause cutting off the chain of causation between

3   Officer Knea's tasing and Plaintiff's injuries.

4       Because reasonable jurors could find Officer Knea's tasing injured Plaintiff, the Court

5   declines to grant Defendants summary judgment on all Plaintiff's claims.

6   **II.    FOURTH AMENDMENT EXCESSIVE FORCE CLAIM**

7       The test for whether force was excessive in violation of the Fourth Amendment is

8   "objective reasonableness."  *See Graham v. Connor,* 490 U.S. 386, 398-99 (1989); *see also*

9   *Gravelet-Blondin v. Shelton,* 728 F.3d 1086, 1090 (9th Cir. 2013) ("The Fourth Amendment,

10  which protects against excessive force in the course of an arrest, requires that we examine the

11  objective reasonableness of a particular use of force to determine whether it was indeed

12  excessive.").  To assess objective reasonableness, courts weigh "the nature and quality of the

13  intrusion on the individual's Fourth Amendment interests against the countervailing governmental

14  interests at stake." *Graham,* 490 U.S. at 396 (quotation marks and citation omitted).  Ultimately,

15  "the [Supreme] Court has emphasized that there are no per se rules in the Fourth Amendment

16  excessive force context; rather, courts must still slosh [their] way through the factbound morass of

17  reasonableness." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (quotation

18  marks omitted (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007))).

19      Plaintiff argues each of Officer Knea's five taser discharges was excessive and therefore

20  unconstitutional.  However, at oral argument, Plaintiff agreed the analysis of the first and second

21  discharges, which occurred while Plaintiff was running toward the water, differs from that of the

22  third, fourth, and fifth discharges, which occurred while Plaintiff was in or near the water.

23  Ultimately, while a reasonable trier of fact could find Officer Knea's first and second deployments

24  were excessive, the potential constitutional violation was not clearly established, so qualified

25  immunity prevents Officer Knea's damages liability.  However, because a reasonable trier of fact

26  could find Officer Knea's third, fourth, and fifth taser deployments constituted unreasonable

27  deadly force, factual disputes prevent the Court from concluding qualified immunity applies.

28

United States District Court
Northern District of California

A.    **First and Second Taser Discharges (On Land)**

  1.    **Constitutional Violation**

    a.    **Severity of the Intrusion**

In the Ninth Circuit, the discharge of a taser in dart mode is generally an intrusion on the individual's Fourth Amendment interests which "involve[s] an intermediate level of force with 'physiological effects, [] high levels of pain, and foreseeable risk of physical injury.'" *Gravelet-Blondin*, 728 F.3d at 1091 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010)). At oral argument, Plaintiff agreed Officer Knea's first and second taser discharges constituted intermediate force.

    b.    **Government Interest in Use of Force**

In determining the governmental interests at stake, the court looks to the "non-exhaustive list of factors" from *Graham v. Connor*, 490 U.S. 386 (1989). *See Gravelet-Blondin*, 728 F.3d at 1091. These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Beyond these factors, the Ninth Circuit instructs courts to "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan*, 630 F.3d at 826 (quotation marks and citation omitted); *see also Mattos*, 661 F.3d at 441 ("[I]n assessing the governmental interests at stake under *Graham,* we are free to consider issues outside the three enumerated above when additional facts are necessary to account for the totality of circumstances in a given case."). This analysis allows courts to "determine objectively the amount of force that is necessary in a particular situation." *Bryan*, 630 F.3d at 826 (quotation marks and citation omitted).

      i.    **Severity of the Crime**

As to the first *Graham* factor—severity of the crime—the parties agree Plaintiff's confirmed offenses, including an incorrectly parked car and expired registration, are not severe. So, the first factor weighs against Officer Knea's use of force.

      ii.    **Immediate Threat to Safety of Officer or Others**

1    The second *Graham* factor asks whether Plaintiff posed an immediate threat to the safety

2    of the officer or others.  *See Mattos*, 661 F.3d at 441 (describing as "most important" factor).

3    "[W]hen [courts] consider whether there was an immediate threat, a 'simple statement by an

4    officer that he fears for his safety or the safety of others is not enough; there must be objective

5    factors to justify such a concern.'"  *Id.* at 441-42 (citation omitted).  Especially when "the person

6    most likely to rebut the officers' version of events . . . can't testify, the judge must carefully

7    examine all the evidence in the record . . . to determine whether the officer's story is internally

8    consistent and consistent with other known facts."  *Cruz*, 765 F.3d at 1079 (cleaned up).

9    Ultimately, "[i]n determining whether there was an immediate threat to safety, the Court must

10   consider the totality of the circumstances . . . from the perspective of a reasonable officer on the

11   scene."  *Tovar v. City of San Jose*, No. 5:21-CV-02497-EJD, 2024 WL 4280950, at \*6 (N.D. Cal.

12   Sept. 24, 2024) (quotation marks omitted; quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774-75

13   (2014)).

14        Although Officer Knea testified he believed Plaintiff posed an immediate threat to safety,

15   reasonable jurors could disagree about whether his stated belief was reasonable.  According to

16   Officer Knea's body worn camera footage, when he discharged his taser Plaintiff was running

17   away from him and did not make any audible threats to him or others.  *See Bryan*, 630 F.3d at

18   832-33 (concluding suspect posed no threat when "the physical evidence demonstrates that [the

19   plaintiff] was not even facing [the officer] when he was shot" with a taser).  In addition, Officer

20   Knea confirmed he never saw a weapon or a bulge in Plaintiff's clothing, and Plaintiff told him he

21   was not armed.  *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (finding no

22   objective basis to believe suspect had a weapon or posed an immediate threat given statements he

23   had no gun and hands showing no weapon).  Officer Knea also twice ordered Plaintiff to return to

24   the rear of the vehicle because he thought Plaintiff was going to retrieve a weapon, which

25   undermines his suspicion Plaintiff was already armed.  And, Officer Knea never mentioned his

26   suspicion Plaintiff was armed on his body worn camera footage, when updating dispatch on the

27   incident, or when talking to other officers about the incident after it occurred.  So, whether Officer

28   Knea's asserted belief Plaintiff posed an immediate threat to his safety "is credible and reasonable

United States District Court
Northern District of California

14

1    presents a genuine question of material fact that must be resolved not by a court ruling on a

2    motion for summary judgment but by a jury in its capacity as the trier of fact." *Young v. Cnty. of*

3    *Los Angeles*, 655 F.3d 1156, 1163-64 (9th Cir. 2011) (refusing to grant summary judgment based

4    on officer's claimed fear for his safety).

5         So, drawing inferences in Plaintiff's favor, a reasonable trier of fact could find Plaintiff did

6    not pose an immediate threat to Officer Knea's or others' safety, such that this factor weighs

7    against his use of force.

8                             iii.    **Resistance**

9         As to the third factor, resistance "should not be understood as a binary state, with

10   resistance being either completely passive or active.  Rather, it runs the gamut from the purely

11   passive protestor who simply refuses to stand, to the individual who is physically assaulting the

12   officer." *Bryan*, 630 F.3d at 830.  Plaintiff's undisputed attempt to flee constitutes some active

13   resistance which weighs in favor of Officer Knea's use of force.  *See Miller v. Clark Cnty.*, 340

14   F.3d 959, 966 (9th Cir. 2003) ("[E]vading arrest by flight . . . favors the government.").  However,

15   Plaintiff's flight "did not involve any violent actions towards the officers," *Mattos*, 661 F.3d at

16   445, and so did not rise to the level of "an individual who is physically assaulting the officer,"

17   *Bryan*, 630 F.3d at 830.  Nevertheless, this third factor weighs slightly in favor of the

18   government's use of force.

19                             c.    **Balancing**

20        To determine whether the officer's action was objectively reasonable, the Court balances

21   his level of force against the governmental interests at stake.  *See Graham*, 490 U.S. at 396; *see*

22   *also id.* at 396-97 ("The 'reasonableness' of a particular use of force must be judged from the

23   perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . .

24   [and] embody allowance for the fact that police officers are often forced to make split-second

25   judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of

26   force that is necessary in a particular situation." (citations omitted)).  Because "the essence of the

27   *Graham* objective reasonableness analysis is that the force which was applied must be balanced

28   against the need for that force, . . . where there is no need for force, any force used is

United States District Court
Northern District of California

1    constitutionally unreasonable." *Headwaters Forest Def.*, 240 F.3d at 1199 (cleaned up).

2    However, the Ninth Circuit has "repeatedly said [] whether the force used to effect an arrest is

3    reasonable 'is ordinarily a question of fact for a jury.'" *Id.* at 1198 (quoting *Liston v. Cnty. of*

4    *Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997)).

5         In his first and second taser discharges, Officer Knea employed an intermediate level of

6    force.  Although Plaintiff was fleeing, the parties agree Plaintiff's crimes were not severe, and—

7    drawing reasonable inferences in Plaintiff's favor—Plaintiff posed no immediate threat to Officer

8    Knea's or others' safety.  So, because reasonable jurors could find the only factor in favor of

9    Officer Knea's taser discharge was Plaintiff's flight, reasonable jurors could also find Officer

10   Knea's tasing Plaintiff was unreasonable and therefore excessive in violation of his Fourth

11   Amendment rights.  *See Azevedo v. City of Fresno*, No. 1:09-CV-375 AWI DLB, 2011 WL

12   284637, at *9 (E.D. Cal. Jan. 25, 2011) ("While Azevedo was clearly in flight when Carr deployed

13   the taser, the Court cannot say as a matter of law that Azevedo's flight made use of the taser

14   reasonable."); *see also Mattos*, 661 F.3d at 445-46 (holding when the plaintiff's "resistance did not

15   involve any violent actions towards the officers," "[a] reasonable fact-finder could conclude,

16   taking the evidence in the light most favorable to [the plaintiff], that the officers' use of force was

17   unreasonable and therefore constitutionally excessive").

18                    **2.    Qualified Immunity**

19        However, "regardless of whether the constitutional violation occurred, the officer should

20   prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have

21   reasonably believed that his particular conduct was lawful."  *Romero v. Kitsap Cnty.*, 931 F.2d

22   624, 627 (9th Cir. 1991).  "The plaintiff bears the burden of proof that the right allegedly violated

23   was clearly established at the time of the alleged misconduct."  *Id.*; *see also Hopson v. Alexander*,

24   71 F.4th 692, 698 (9th Cir. 2023) ("Plaintiffs asserting excessive force claims must thus point to

25   an existing rule that 'squarely governs' the facts at issue and that moves the officer's actions

26   outside the 'hazy border between excessive and acceptable force.'" (citation omitted)).  "The

27   'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was

28   unlawful in the situation he confronted.'"  *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022)

United States District Court
Northern District of California

16

1    (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam)).

2         Ninth Circuit caselaw has not clearly established an officer's discharging a taser, as an

3    intermediate level of force, on an individual in flight, violates the Fourth Amendment.  Plaintiff

4    argues "it [is] clearly established . . . that discharging a taser on a non-threatening individual who

5    had not committed a serious crime and had not engaged in aggressive or violent resistance would

6    violate the Fourth Amendment."  *Del Valle v. Thorne*, 790 F. App'x 868, 870 (9th Cir. 2020)

7    (citing *Mattos*, 661 F.3d at 445-46).  However, in each of the cases Plaintiff cites, the Ninth

8    Circuit found the officers' force unreasonable in part because the individual was *not* fleeing.  For

9    example, in *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010), the Ninth Circuit held an officer

10   used excessive force when tasing a suspect who was "stopped [] for the most minor of offenses,"

11   "was clearly unarmed," and "did not physically confront the officer," but also "never attempted to

12   flee."  *See id.* at 832-33.  Similarly, in *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011), the Ninth

13   Circuit found an officer used excessive force when tasing a woman three times who had been

14   accused of minor offenses, posed no immediate threat, and "did not evade arrest by flight."  *See id.*

15   at 445-46.

16        Plaintiff argues "officials can still be on notice even in novel factual circumstances."  *See*

17   *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir.

18   2005) (citing *Hope v. Peltzer*, 536 U.S. 730, 741 (2002)).  But because resistance is the third

19   *Graham* factor, courts have consistently recognized a suspect's flight as an important element in

20   evaluating whether an officer's tasing was excessive.  *See Silva v. Chung*, 740 F. App'x 883, 886

21   (9th Cir. 2018) (finding excessive force when the person tased "never actively attempted to evade

22   arrest by flight"); *Del Valle*, 790 F. App'x at 869-70 (finding excessive force when officer tased

23   person who refused to get up from his bed); *Gravelet-Blondin*, 728 F.3d at 1091-92 (finding

24   excessive force when the person tased "did not resist arrest or attempt to escape"); *see also Jones*

25   *v. Las Vegas Metropolitan Police Dep't*, 873 F.3d 1123, 1130-31 (9th Cir. 2017) (finding use of

26   taser on restrained suspect constituted excessive deadly force); *Cavanaugh v. Woods Cross City*,

27   625 F.3d 661, 665 (10th Cir. 2010) (refusing summary judgment on excessive force claim because

28   jury could conclude individual was "neither actively resisting nor fleeing arrest"); *Azevedo*, 2011

United States District Court
Northern District of California

17

WL 284637, at *15 ("Given . . . the active flight and evasion of Azevedo . . . the Court concludes that the law regarding taser use was not clearly established such that a reasonable officer in Carr's position would know that use of the taser on Azevedo was improper."). So, although a reasonable trier of fact could find unreasonable Officer Knea's tasing Plaintiff twice, with an intermediate level of force, while Plaintiff was fleeing, the tasing did not violate clearly established law in the Ninth Circuit.

Plaintiff also cites *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), in which the Ninth Circuit considered officers' training "explaining specifically that when one or more officers are kneeling on a subject's back or neck to restrain him, compression asphyxia can result . . . [and] caus[e] death" as evidence "reasonable officers would have been on notice that the force employed was objectively unreasonable." *Id.* at 1062 (cleaned up). Like in *Drummond*, EBRPD's Taser Policy, on which Officer Knea was trained, stated "[m]ere flight from a pursuing officer, without additional circumstances or factors, is not good cause for the use of the [taser] to apprehend an individual." (Dkt. No. 105-24 at 3.) However, Officer Knea reasonably could have believed the woman's black eye, Plaintiff's giving a false name, and Plaintiff's not having been searched sufficed as "additional circumstances or factors" to justify his taser discharges under EBRPD's Taser Policy. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (emphasizing "the information the [] officers possessed" at the time of their actions). Furthermore, *Drummond* is distinguishable because it involved deadly force and found the officers' constitutional violation clearly established based not just on the police department's training, but also on several prior cases and newspaper publicity about the danger of their conduct. *See Drummond*, 343 F.3d at 1061-62.

Plaintiff also contends a combination of district court opinions show Officer Knea's Fourth Amendment violation was clearly established. The Ninth Circuit has directed "[i]n the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* at 1060 (cleaned up); *see also Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002) ("[D]ecisions of district courts may inform our qualified immunity

analysis.").  But the district court opinions Plaintiff cites do not demonstrate the law was clearly established.  In two of the cases, the district courts did not conclusively find a Fourth Amendment violation; instead, they denied summary judgment because several factual disputes prevented the Court from determining, as a matter of law, the officers had not used excessive force on fleeing suspects.  *See C.M.O. v. Cnty. of San Mateo*, No. 19-CV-02992-SI, 2021 WL 3932011, at *4 (N.D. Cal. Sept. 2, 2021); *Azevedo*, 2011 WL 284637, at *9.  In *Hesterberg v. United States*, 71 F. Supp. 3d 1018 (N.D. Cal. 2014), this Court did find an officer's tasing was unreasonable "in stopping a fleeing, nonviolent, non-serious misdemeanant, who posed no threat to [the officer] or the public, who was not sufficiently warned prior to the tasing, and who [the officer] knew had an undefined heart condition." *Id.* at 1036-37 (finding for Plaintiff on battery claim based on tasing following dog-leash law violation).  Ultimately, however, "[a]t most, [these cases] show that the law was in the process of becoming established," *see Sorrels*, 290 F.3d at 971, and so are insufficient to show Officer Knea could not have reasonably believed his taser discharges were reasonable.

So, although reasonable jurors could find Officer Knea's first and second taser discharges violated Plaintiff's Fourth Amendment rights, because such rights were not clearly established, Officer Knea is entitled to qualified immunity and therefore summary judgment on this part of Plaintiff's Fourth Amendment excessive force claim.

### B.    Third, Fourth, and Fifth Taser Discharges (In or Near Water)

Unlike Officer Knea's first and second taser discharges, his third, fourth, and fifth discharges occurred while Plaintiff approached or after Plaintiff had entered the water.  The Fourth Amendment excessive force analysis therefore differs; in particular, reasonable jurors could find Officer Knea's taser discharges near or in the water constituted a deadly, rather than an intermediate, level of force.  Given this factual dispute, reasonable jurors could find Officer Knea violated both Plaintiff's Fourth Amendment rights and clearly established law, so the Court cannot grant Officer Knea summary judgment based on qualified immunity.

\\

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.    Constitutional Violation

#### a.    Severity of Intrusion

"[D]eadly force [i]s force that creates a substantial risk of causing death or serious bodily injury." *City of Hemet*, 394 F.3d at 693; *see also Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1155 (E.D. Cal. 2016) ("The conduct need not have actually caused serious injury or death to be considered lethal force; it is the risk of that result that turns the screw."). Although "use of tasers can be intermediate force," certain uses of tasers "create[] a substantial risk of serious injury or death" and therefore can constitute deadly force. *See Jones*, 873 F.3d at 1130-31 (holding reasonable jury could find "officers' repeated and simultaneous use of tasers for over ninety seconds was unreasonable" deadly force). For example, several courts have held officers' tasing "an individual who is positioned on an elevated surface at a height that carries with it a risk of serious injury or death [by] causing the individual to fall" may deploy deadly force. *See Peroza-Benitez v. Smith*, 994 F.3d 157, 167-68 (3d Cir. 2021) (collecting cases); *see also Bradley v. Benton*, 10 F.4th 1232, 1240-41 (11th Cir. 2021) (holding reasonable jury could find officer "applied deadly force" when "shooting a taser [] at a person on top of an eight-foot wall," "temporarily paralyzing him and causing him to fall").

Reasonable jurors could find Officer Knea's tasing Plaintiff while he approached or was in the water created a substantial risk of causing Plaintiff to drown, and therefore of serious bodily injury or death. Axon's product warnings and EBRPD's Taser Policy warn against tasing someone in the water due to the risk of "collateral injury;" as Axon notes, tasers can cause "loss of control from muscle contraction, incapacitation, or startle response" or "physiologic or metabolic changes that may increase the risk of death or serious injury." (Dkt. No. 105-24 at 3-4; Dkt. No. 105-25 at 3-4.) Officer Knea also "agreed" the "concern" regarding using a Taser in the water, "like when an individual is in an elevated position, stems from the collateral injuries that can occur (i.e., drowning in water . . .)." (Dkt. No. 101-25 at 27.) In addition, Plaintiff's police practices expert Mr. Norton opines Officer Knea's "use of [a] Taser in [an] attempt to achieve NMI in a body of water created a risk of deadly force" "because causing someone NMI in a body of water is substantial risk of serious bodily injury or death." (Dkt. No. 105-27 at 51.) So, drawing

20

1   inferences in Plaintiff's favor, reasonable jurors could find tasing Plaintiff while he was on the

2   water's shore or in the water created a substantial risk of Plaintiff's drowning and therefore

3   constituted deadly force.

4        Defendants' arguments there was no risk of Plaintiff's death, serious bodily injury, or

5   drowning are unavailing.  First, reasonable jurors could find the risk of Plaintiff's drowning

6   existed even if the water was shallow.  Second, Defendants' argument Officers Knea and Galindo

7   would have retrieved Plaintiff from the water before any serious bodily injury, death, or drowning

8   occurred is not dispositive, especially in light of evidence Officer Knea had no training on

9   "apprehending a fleeing or uncooperative suspect from a body of water," and Defendants' police

10  practices expert Mr. Fonzi's opinion "[i]f the officers had entered the water to perform a rescue,

11  their safety would have been severely compromised."  (Dkt. No. 101-25 at 29; Dkt. No. 101-22 at

12  12.)

13       So, reasonable jurors could find Officer Knea used deadly force when discharging his taser

14  three times while Plaintiff approached or had entered the water.

### b.    Government Interests

16       The government's interest in using force largely remained the same once Plaintiff

17  approached and entered the water.  First, Plaintiff's confirmed offenses remained minor, so the

18  severity of the crime weighs against the government.  As to whether Plaintiff posed an immediate

19  threat to the safety of Officer Knea or others, a reasonable trier of fact could find Officer Knea did

20  not reasonably suspect Plaintiff was armed and therefore Plaintiff was not an immediate threat.

21  But, in any event, Officer Knea noted he no longer believed Plaintiff was "getting ready to return

22  fire" once he approached the water.  (Dkt. No. 105-28 at 99, 104.)  However, as Plaintiff

23  continued to evade arrest, the third factor still weighs slightly in the government's favor.

### c.    Balancing

25       As with the first two taser discharges, the Court balances Officer Knea's level of force

26  against the government's interest in using such force.  *See Graham*, 490 U.S. at 396.  If Officer

27  Knea used intermediate force, the balancing for the final three discharges is similar to the

28  balancing for the first two discharges, and reasonable jurors could find his level of force excessive.

United States District Court
Northern District of California

However, "[a]n officer's use of *deadly* force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). So, if Officer Knea used deadly force by discharging his taser on Plaintiff near or in the water, Plaintiff's flight alone would not justify Officer Knea's force. Instead, Officer Knea's use of force would only be reasonable if he had "probable cause to believe that [Plaintiff] pose[d] a significant threat of death or serious physical injury to [Officer Knea] or others." *Id.* But, as previously explained, a reasonable trier of fact could find Officer Knea did not have probable cause to believe Plaintiff posed a significant threat. *See Headwaters Forest Def.*, 240 F.3d at 1198 ("[W]hether the force used to effect an arrest is reasonable is ordinarily a question of fact for the jury." (quotation marks and citation omitted)). So, factual disputes, including whether Officer Knea used deadly force and whether he had probable cause to believe Plaintiff posed a significant threat of death or serious physical injury to Officer Knea or others, prevent the Court from deciding as a matter of law Officer Knea's use of force was reasonable.

Because reasonable jurors could find Officer Knea's tasing Plaintiff near or in the water was unreasonable and therefore violated Plaintiff's Fourth Amendment rights, Defendants are not entitled to summary judgment on the merits of Plaintiff's Fourth Amendment claim for the final three taser discharges.

### 2. Qualified Immunity

It is clearly established "[a]n officer's use of *deadly* force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott*, 39 F.3d at 914 (quoting *Garner*, 471 U.S. at 3.). The Ninth Circuit and other circuits have also clearly established use of a taser can constitute deadly force. *See Jones*, 873 F.3d at 1131 (holding "continuous, repeated and simultaneous tasings" could amount to deadly force); *see also Peroza-Benitez*, 994 F.3d at 169 (finding "'clearly established' right at the time for an injured, visibly unarmed suspect to be free from temporarily paralyzing force while positioned . . . [at] a second-story window"); *Bradley*, 10 F.4th at 1243 (holding officer violated clearly established law by using deadly force "when he shot [the suspect] off the

eight-foot wall with a taser").

Specifically, in *Jones v. Las Vegas Metropolitan Police Department*, 873 F.3d 1123 (9th Cir. 2017), the Ninth Circuit considered an excessive force claim based on "officers' repeated and simultaneous use of tasers for over ninety seconds." *Id.* at 1131. The panel considered evidence (1) taser users received "product warnings that the risk of 'serious injury or death' from tasers increases with multiple and simultaneous applications;" (2) an officer testified "such use was discouraged, though not forbidden," by the police department; (3) and "[c]onsistent with [the] Taser's product warnings, the officers were instructed that repeated taser applications could contribute to serious injury or death." *Id.* The plaintiff's police practices expert also opined "reasonably trained officers would have known that repeated and simultaneous taser use poses a risk of serious injury or death." *Id.* So, the Ninth Circuit concluded "a jury could reasonably conclude that the officers knew or should have known that their use of tasers created a substantial risk of serious injury or death," and there remained "triable issues of fact as to whether . . . the officers were on notice that the force they used could cause serious injury or death." *Id.* And, as to qualified immunity, the Ninth Circuit held the evidence established "continuous, repeated and simultaneous tasings are different from isolated shocks" such that "[a]ny reasonable officer would have known that such use can only be justified by an immediate or significant risk of injury or death to the officers or the public," and "the question of qualified immunity [needed to] proceed to trial." *Id.* at 1132.

Plaintiff presents evidence similar to that considered in *Jones*. Officer Knea was trained on Axon's Taser 10 product warnings, which state users should "avoid using" the taser on a person "located in water, mud or marsh environment." (Dkt. No. 105-25 at 3.) He was also trained to follow EBRPD's Taser Policy, which states using a taser on "[i]ndividuals whose position or activity may result in collateral injury (e.g., . . . located in water . . . )" "should generally be avoided." (Dkt. No. 105-24 at 3-4.) Officer Knea also acknowledged he knew he was "not supposed to fire [the taser] while the guy is in the water" and explained "the concern regarding the TASER's usage in water . . . stems from the collateral injuries that can occur (i.e., drowning in water)." (Dkt. No. 105-29 at 17; Dkt. No. 101-25 at 27.) In addition, Plaintiff's

police practices expert opined officers are trained "misuse" of a taser "can convert an intermediate use of force to a deadly use of force," which would include the "misuse of a Taser against someone in a body of water . . . because causing someone NMI in a body of water is a substantial risk of serious bodily injury or death."  (Dkt. No. 105-27 at 50-51.)

So, drawing reasonable inferences in Plaintiff's favor, reasonable jurors could find Officer Knea "should have known" or was "on notice" discharging his taser at Plaintiff while Plaintiff was near or in the water risked his drowning and therefore serious injury or death.  *See Jones*, 873 F.3d at 1131.  Furthermore, at oral argument, Defendants agreed it is clearly established deadly force is unreasonable absent probable cause to believe a suspect poses a significant threat of death or serious physical injury to the officer or others.  So, like in *Jones*, because reasonable jurors could find Officer Knea should have known or was on notice his tasing Plaintiff near or in the water constituted deadly force which was unreasonable absent a significant risk of injury or death, the question of qualified immunity must proceed to trial.

Defendants' arguments to the contrary are unavailing.  In particular, at oral argument, Defendants contended because the EBRPD Taser Policy states using a taser in water "should generally be avoided unless the totality of the circumstances indicates" otherwise, (Dkt. No. 105-24 at 3), Officer Knea's suspicion Plaintiff was armed and involved in domestic violence constituted special circumstances justifying the use of the taser on Plaintiff in the water.  However, if Officer Knea's final three taser discharges constituted deadly force, then—as Defendants admit—Officer Knea still should have known he needed probable cause to believe Plaintiff seriously threatened his or others' safety.  Further, a reasonable trier of fact could find Officer Knea did not reasonably suspect Plaintiff was armed.  Defendants also emphasize the absence of Ninth Circuit case law specifically addressing tasing in the water.  But *Jones* did not require prior cases on repeated tasings; instead, because the law surrounding the application of deadly force was so clearly established, the Ninth Circuit considered sufficient the evidence "officers were on notice that the force they used could cause serious injury or death."  *See Jones*, 873 F.3d at 1131.  Here, reasonable jurors could similarly find officers were on notice tasing an individual in the water constituted deadly force such that Officer Knea violated sufficiently "well-defined" law.  *See City*

1    *of Tahlequah*, 595 U.S. at 12 ("[T]he rule's contours must be so well-defined that it is clear to a

2    reasonable officer that his conduct was unlawful in the situation he confronted."); *see also*

3    *Bradley*, 10 F.4th at 1243-44 (considering tasing individual at elevated height and holding law

4    regarding deadly force so clearly established "that the use of force here was obviously

5    unconstitutional even absent a case directly on point").

6         So, reasonable jurors could find Officer Knea, by discharging his taser at Plaintiff while he

7    was near or in the water, employed unreasonable intermediate force or deadly force without

8    probable cause, and therefore violated his Fourth Amendment rights.  And, because reasonable

9    jurors could also find Officer Knea should have known his taser discharges constituted deadly

10   force and violated clearly established law regarding when deadly force is reasonable, the Court

11   does not—as to Officer Knea's final three taser discharges—grant Defendants summary judgment

12   on qualified immunity grounds.

13   **III.    FOURTEENTH AMENDMENT STATE-CREATED DANGER CLAIM**

14        **A.    Constitutional Violation**

15        "[A]lthough the state's failure to protect an individual against private violence does not

16   generally violate the guarantee of due process, it can where the state action 'affirmatively place[s]

17   the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to

18   danger which he or she would not have otherwise faced."  *Kennedy v. City of Ridgefield*, 439 F.3d

19   1055, 1061 (9th Cir. 2006) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S.

20   189, 197 (1989)).  Under the state-created danger doctrine, "the state may be constitutionally

21   required to protect a plaintiff that it affirmatively places in danger by acting with deliberate

22   indifference to a known or obvious danger."  *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (9th Cir.

23   2023) (quotation marks and citation omitted), *cert. denied*, 144 S. Ct. 88 (2023).  "To succeed on a

24   state-created danger claim, a plaintiff must establish that (1) a state actor's affirmative actions

25   created or exposed him to an actual, particularized danger that he would not otherwise have faced,

26   (2) that the injury he suffered was foreseeable, and (3) that the state actor was deliberately

27   indifferent to the known danger."  *Id.* (cleaned up).

28        However, in some cases a plaintiff may need to show the state actor "acted with a purpose

United States District Court
Northern District of California

1    to harm . . . that was unrelated to legitimate law enforcement objectives"—rather than only

2    deliberate indifference.  *See Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008); *see also Cnty.*

3    *of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998) ("[P]urpose to cause harm is . . . needed for due

4    process liability in a pursuit case.").  Courts "decide which test to apply by asking whether the

5    circumstances are such that actual deliberation by the officer is practical."  *Estate of Soakai v.*

6    *Abdelaziz*, 137 F.4th 969, 976 (9th Cir. 2025) (cleaned up; quoting *Wilkinson v. Torres*, 610 F.3d

7    546, 554 (9th Cir. 2010)).  Specifically, "[b]ecause officers engaged in a high-speed chase must

8    operate under great pressure and make repeated split-second decisions with precious little time for

9    deliberation, . . . we apply the more stringent purpose-to-harm test to all high-speed chases."  *Id.* at

10   976-77 (cleaned up).

11          Plaintiff argues by chasing him into and then tasing him in the water, Officer Knea

12   exposed Plaintiff to the danger of drowning.  Because there remain factual disputes regarding the

13   extent to which the tasings caused Plaintiff's injuries, Defendants' argument the taser did not

14   incapacitate Plaintiff, so Officer Knea's actions could not have exposed him to the danger of

15   drowning are unavailing.  In addition, even if Plaintiff voluntarily entered the water, reasonable

16   jurors could find Officer Knea's tasing him in the water placed him in a "worse position than that

17   in which [Plaintiff] would have been had [Officer Knea] not acted at all."  *See Johnson v. City of*

18   *Seattle*, 474 F.3d 634, 641 (9th Cir. 2007) (cleaned up) (finding police's actions were not state-

19   created danger because they placed plaintiffs in "no worse position").

20          Plaintiff also cites evidence from which reasonable jurors could conclude Plaintiff's

21   drowning was foreseeable and Officer Knea acted with deliberate indifference by tasing him in the

22   water and leaving him there.  As to foreseeability, after tasing him, Officer Knea said, "You're

23   going to end up drowning."  (Dkt. No. 105-1 at 18:40-18:45.)  Officer Knea also knew he "'should

24   not' deploy" the [taser] in water" because of "the concern . . . [about] collateral injuries that can

25   occur (i.e., drowning)."  (Dkt. No. 101-25 at 27.)  And, he chose not to pursue Plaintiff into the

26   water because it "had a current" and "was frigid," so "[e]ntering to grab him was unsafe and

27   unreasonable, if not impossible," and instead, "recognizing a drowning risk," Officer Galindo

28   requested medical personnel.  (Dkt. No. 101-2 ¶¶ 29-33.)  As to deliberate indifference, EBRPD's

United States District Court
Northern District of California

1    policy manual and Axon's Taser instructions both warn against using a taser in water due to the

2    risks of collateral injury, and Sergeant Starick testified Officer Knea was trained on such

3    warnings.  So, there is evidence from which reasonable jurors could find Officer Knea

4    "recognize[d] the unreasonable risk" of tasing him in the water, and "actually intend[ed] to expose

5    [him] to such risks without regard to the consequences."  *Sinclair*, 61 F.4th at 680 (cleaned up).

6         Defendants contend because Officer Knea was pursuing Plaintiff when he tased him,

7    Plaintiff must show Officer Knea's purpose to harm him, rather than only deliberate indifference.

8    Defendants argue because "[t]he record shows efforts to detain a fleeing, unsearched suspect,

9    warnings, a single less-lethal attempt, staging of medical, and scene management," there can be

10   "no evidence of a purpose to harm."  (Dkt. No. 101 at 39.)  However, based on Officer Knea's

11   body worn camera recording, Plaintiff argues once he was in the water, he "started to crawl

12   backwards in fear from the officers," and "was on his belly in the water" when Officer Knea

13   discharged the taser for the fifth time.  (Dkt. No. 107 at 11.)  Plaintiff's conduct therefore differs

14   from the plaintiff's conduct in cases applying the purpose-to-harm standard to high-speed car or

15   motorcycle chases.  *See Estate of Soakai*, 137 F.4th at 975 ("Defendants began pursuing the

16   suspect through busy city streets at speeds exceeding 60 miles per hour."); *Lewis*, 523 U.S. at 837

17   (explaining officers pursued motorcycle which "reached speeds up to 100 miles an hour" for "75

18   seconds over a course of 1.3 miles in a residential neighborhood, [where] the motorcycle wove in

19   and out of oncoming traffic, forcing two cars and a bicycle to swerve off the road").  In addition,

20   Officer Knea testified he did not see any bystanders in the vicinity whom Plaintiff's conduct

21   threatened.  *Cf. Moreland v. Las Vegas Metropolitan Police Dep't*, 159 F.3d 365, 372 (9th Cir.

22   1998) (explaining the purpose to harm standard applies to situations in which "the officer was

23   required to act quickly to prevent an individual from threatening the lives of others").  So,

24   reasonable jurors could find Officer Knea was no longer engaged in a "high-speed chase" when he

25   fired the taser at Plaintiff in the water, in which case the purpose to harm standard would not

26   apply.

27        However, Defendants are entitled to summary judgment on the theory Officer Knea

28   violated Plaintiff's Fourteenth Amendment rights by impeding his access to medical care.  Officer

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Knea confirmed he did not report Plaintiff's tasing to dispatch, and Plaintiff's expert Dr. Schreiber

2    opined "a more rapid [medical] response would have shaved a few minutes off the response time .

3    . . and possibly prevent[ed] [Plaintiff's] cardiac arrest." (Dkt. No. 105-20 at 9.) But Plaintiff cites

4    no evidence from which reasonable jurors could conclude EBRPD officers or medical personnel

5    would have performed a more rapid rescue or otherwise responded differently if Officer Knea had

6    reported to dispatch his tasing of Plaintiff. And, ultimately, Officer Knea's failure to report his

7    tasing constitutes inaction rather than the affirmative action necessary for a state-created danger

8    claim. *See Kennedy*, 439 F.3d at 1063 n.4 ("The critical distinction is not . . . an indeterminate

9    line between danger creation and enhancement, but rather the stark one between state action and

10   inaction in placing an individual at risk." (quotation marks and citation omitted)).

11       So, while factual disputes prevent summary judgment in Defendants' favor on Plaintiff's

12   theory of state-created danger caused by Officer Knea's chasing Plaintiff into the water, tasing

13   him, and leaving him there, Defendants are entitled to summary judgment on Plaintiff's impeding

14   access to medical care theory.

15       **B.    Qualified Immunity**

16       At a high level, "the law [is] clearly established that officers may be liable where they

17   affirmatively place an individual in danger." *Kennedy*, 439 F.3d at 1066 (quotation marks and

18   citation omitted). But "'clearly established law' should not be defined 'at a high level of

19   generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation omitted). Instead, "[a] clearly

20   established right is one that is sufficiently clear that every reasonable official would have

21   understood that what he is doing violates that right." *Isayeva v. Sacramento Sheriff's Dep't*, 872

22   F.3d 938, 946 (9th Cir. 2017) (quotation marks and citation omitted).

23       The cases upon which Plaintiff relies do not make clear to a reasonable officer that chasing

24   a suspect into and tasing him in the water would violate his Fourteenth Amendment rights. In

25   *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), an officer arrested a driver; ordered the plaintiff

26   out of the car, which he impounded; and drove away, leaving the plaintiff in a dangerous

27   neighborhood, where she was raped. *Id.* at 586. Unlike the officer in *Wood*, who ordered the

28   plaintiff to exit the car into a dangerous environment, Officer Knea did not order Plaintiff into the

water; rather, he pursued Plaintiff as Plaintiff ran toward and then into the water.  In *Wood* and similar cases, the Ninth Circuit has focused on how the officers' orders and directions to the plaintiff exposed them to danger.  *See Bracken v. Okura*, 869 F.3d 771, 778-79 (9th Cir. 2017) (explaining officer "helped detain [plaintiff] and prevented him from leaving the party" by "st[anding] directly in front of him" when assault began); *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1084-85 (9th Cir. 2000) (explaining officer "took [the plaintiff] physically by the arm and walked him out the front door," and he subsequently died from hypothermia); *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) (explaining officers "(1) actively prevented the Attendees from leaving safely through alternative exits, (2) directed the Attendees to leave from a single exit, and (3) required the Attendees to turn north into the crowd of violent anti-Trump protestors" (cleaned up)).  So, even if *Wood* and subsequent cases placed reasonable officers on notice they should not order or direct a plaintiff into a dangerous situation, they did not place officers on notice they should not pursue a plaintiff moving toward a dangerous situation.

    The other cases Plaintiff cites are even more factually distinct and therefore insufficient to put a reasonable officer in Officer Knea's situation on notice.  *See Kennedy*, 439 F.3d at 1063 (finding state-created danger claim when officer told the accused the plaintiff had accused him of child molestation, and the accused then shot the plaintiff); *Henry A. v. Willden*, 678 F.3d 991, 1003 (9th Cir. 2012) (finding state-created danger claim when officers placed children in dangerous foster homes); *Martinez v. City of Clovis*, 943 F.3d 1260, 1273 (9th Cir. 2019) (holding reasonable jury could find state-created danger claim against officer who, by praising individual accused of domestic abuse, emboldened his subsequent abuse of the plaintiff).

    In addition, because Defendants are entitled to summary judgment on Plaintiff's state-created danger claim related to Officer Knea's impeding Plaintiff's access to medical care, the Court does not consider whether such a right was clearly established.  *See Mattos*, 661 F.3d at 440 ("In determining whether an officer is entitled to qualified immunity . . . first, we decide whether the officer violated a plaintiff's constitutional right.").  So, the Ninth Circuit cases recognizing a state-created danger claim based on an officer's impeding medical care are not applicable.  *See*

1   *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013); *Penilla v. City of Huntington*

2   *Park*, 115 F.3d 707, 709-10 (9th Cir. 1997); *Estate of Soakai*, 137 F.4th at 983-84.

3           Ultimately, Plaintiff identifies no case in which an officer's chasing a suspect or using a

4   taser gave rise to a state-created danger claim.  So, although Plaintiff presents a viable state-

5   created danger claim based on Officer Knea's chasing him into and then tasing him in the water,

6   Officer Knea is entitled to qualified immunity and summary judgment on Plaintiff's Fourteenth

7   Amendment claim.

8   **IV.    *MONELL* FAILURE TO TRAIN CLAIM**

9           To state a *Monell* claim, a plaintiff must show "(1) that [he] possessed a constitutional

10  right of which []he was deprived; (2) that the municipality had a policy; (3) that this policy

11  amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is

12  the moving force behind the constitutional violation."  *Dougherty v. City of Corvina*, 654 F.3d

13  892, 900 (9th Cir. 2011) (quotation marks and citation omitted).  As to the third requirement, a

14  "[f]ailure to train may amount to a policy of 'deliberate indifference,' if the need to train was

15  obvious and the failure to do so made a violation of constitutional rights likely."  *Id.* (citing *City of*

16  *Canton v. Harris*, 489 U.S. 378, 390 (1989)).  "[I]t may happen that in light of the duties assigned

17  to specific officers or employees the need for more or different training is so obvious, and the

18  inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the

19  city can reasonably be said to have been deliberately indifferent to the need."  *City of Canton*, 489

20  U.S. at 390.

21          "Ordinarily, a pattern of similar constitutional violations, rather than proof of a single

22  incident, is necessary to demonstrate deliberate indifference."  *Perez v. City of Fresno*, 98 F.4th

23  919, 931 (9th Cir. 2024) (cleaned up).  "Nonetheless, single-incident liability may exist in the rare

24  case where the unconstitutional consequences of failing to train are patently obvious."  *Id.*

25  (cleaned up); *see also Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) ("A

26  plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of

27  constitutional violations where 'a violation of federal rights may be a highly predictable

28  consequence of a failure to equip law enforcement officers with specific tools to handle recurring

United States District Court
Northern District of California

1    situations.'" (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997))).

2        Reasonable jurors could find EBRPD had a policy of failing to train officers regarding the

3    discharge of tasers on individuals in water which was the moving force behind Officer Knea's

4    Fourth and Fourteenth Amendment violations.  Although Defendants present significant evidence

5    of Officer Knea's training on how to use conducted-energy weapons and the Taser 10, they do not

6    present any evidence Officer Knea was trained on using tasers on individuals in bodies of water.

7    And, drawing reasonable inferences in Plaintiff's favor, Officer Knea acting as though it was

8    reasonable to repeatedly discharge his taser on a fleeing person in the water—and potentially

9    deploy deadly force—supports an inference of inadequate training.  Furthermore, in his interview,

10   Officer Knea explained he understood EBRPD's Taser Policy to merely "suggest[] officers

11   'should not' deploy the weapon in water."  (Dkt. No. 101-25 at 27.)  Officer Knea also believed he

12   could discharge the taser at Plaintiff in the water because he and Officer Galindo "would have

13   been in a position to immediately extract [Plaintiff] from the water," even though "he had never

14   received any training regarding apprehending a fleeing or uncooperative suspect from a body of

15   water."  (Dkt. No. 101-25 at 29, 63.)  In addition, that EBRPD ordered an investigation into

16   Officer Knea's conduct and found no wrongdoing supports a reasonable inference of an EBRPD

17   policy or custom.  (Dkt. No. 101-25.)  *See Larez v. City of Los Angeles*, 946 F.3d 630, 647 (9th

18   Cir. 1991) ("The jury properly could find such policy or custom from the failure of [city

19   policymaker] to take any remedial steps after the violation.").  So, reasonable jurors could find

20   EBRPD had a policy of failing to train officers on using tasers on individuals in water, including

21   on when such use is appropriate and how to respond after doing so.

22       Reasonable jurors could also find EBRPD's failure to train amounted to deliberate

23   indifference.  EBRPD's Taser Policy warned against using tasers on people in water, which

24   supports a reasonable inference EBRPD recognized the importance of such a policy, and so acted

25   with deliberate indifference by inadequately training officers on that policy.  *See Long*, 442 F.3d at

26   1188 ("A county's failure adequately to train its employees to implement a facially valid policy

27   can amount to deliberate indifference.").  Furthermore, as both Sargent Starick and Officer Knea

28   noted, EBRPD's jurisdiction includes a significant amount of shoreline, reservoirs, and water,

United States District Court
Northern District of California

which EBRPD officers are tasked with patrolling.  So, in light of EBRPD officers' duties, reasonable jurors could find the "unconstitutional consequences of failing to train" officers on how to use force on individuals in the water or retrieve individuals from the water "patently obvious." *Perez*, 98 F.4th at 931; *see also City of Canton*, 498 U.S. at 390 (considering "the duties assigned to specific officers or employees" in finding obvious failure to train).  At the very least, reasonable jurors could conclude EBRPD's "training was so inadequate regarding how to safely" discharge a taser on a person in the water "that it amounted to deliberate indifference to the rights of persons with whom the police come into contact."  *See Nelson v. City of Hayward*, No. 3:16-CV-07222-SK, Dkt. No. 92 at 19 (N.D. Cal. Mar. 1, 2019) (denying motion for summary judgment on *Monell* claim based on failure to train officers on using WRAP device on persons with disabilities or obesity).

So, as reasonable jurors could find EBRPD had a policy of failing to train or inadequately training officers on using tasers on individuals in the water and the failure to train amounted to deliberate indifference to individuals' constitutional rights, the Court denies Defendants' motion for summary judgment on the *Monell* claim.

## V.    STATE LAW CLAIMS

### A.    Negligence

Under California law, a public entity is only liable for the negligent acts of its employees if the plaintiff establishes the employee's negligence.  *See* Cal. Gov't Code § 815.2.  To show an officer's negligence, the plaintiff must show: "(1) the officer owed the plaintiff a duty of care, (2) the officer breached the duty by failing to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise, (3) there was a proximate causal connection between the officer's negligent conduct and the resulting injury to the plaintiff, and (4) the officer's negligence resulted in an actual loss or damage to the plaintiff."  *M.H. v. County of Alameda*, 62 F. Supp. 3d 1049, 1097 (N.D. Cal. 2014) (citing *Harris v. Smith*, 157 Cal. App. 3d 100, 104 (1984)).  "A duty of care [] arise[s] when an officer engages in an affirmative act which places the person in peril or increases the risk of harm" to them.  *Lugtu v. California Highway Patrol*, 26 Cal. 4th 703, 717 (2001) (cleaned up).

United States District Court
Northern District of California

1    Defendants argue they are entitled to summary judgment because Officer Knea did not

2   expose Plaintiff to danger and therefore owed Plaintiff no duty, did not breach any duty because

3   he used reasonable force, and did not cause Plaintiff's injuries.  However, as explained in

4   addressing Plaintiff's Fourteenth Amendment state-created danger claim and Defendants'

5   causation arguments, reasonable jurors could find Officer Knea exposed Plaintiff to danger, used

6   reasonable force, and caused Plaintiff's injuries, so neither Officer Knea nor EBRPD is entitled to

7   summary judgment on Plaintiff's negligence claim.

8        **B.    Battery**

9    To succeed on a common law battery claim, a plaintiff must prove the officer used

10   unreasonable force.  *See Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008).  "In California,

11   '[c]laims that police officers used excessive force in the course of an arrest, investigatory stop or

12   other seizure of a free citizen are analyzed under the reasonableness standard of the Fourth

13   Amendment of the United States Constitution.'"  *Avina v. United States*, 681 F.3d 1127, 1131 (9th

14   Cir. 2012) (quoting *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102 (2004)).  As

15   explained in the Court's discussion of Plaintiff's Fourth Amendment excessive force claim,

16   reasonable jurors could find Officer Knea used unreasonable force in each of his five taser

17   discharges.  So, Defendants are not entitled to summary judgment on Plaintiff's battery claim.

18       **C.    Bane Act**

19   A Bane Act claim requires showing an officer had the specific intent to violate an

20   individual's constitutional or statutory rights.  *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030,

21   1043 (9th Cir. 2018) (citing *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 801

22   (2017) ("Section 52.1 is tested by whether the circumstances indicate the arresting officer had a

23   specific intent to violate the arrestee's right to freedom from unreasonable seizure.")).

24   "[E]vidence simply showing that an officer's conduct amounts to a constitutional violation under

25   an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement

26   under the Bane Act."  *Losee v. City of Chico*, 738 F. App'x 398, 401 (9th Cir. 2018) (citation

27   omitted).  "Rather, the jury must find that the defendants intended not only the force, but its

28   unreasonableness, its character as more than necessary under the circumstances."  *Reese*, 888 F.3d

United States District Court
Northern District of California

at 1045 (quotation marks and citation omitted).

Defendants do not explain how based on this record a jury could not find Officer Knea acted without the specific intent to violate Plaintiff's Fourth or Fourteenth Amendment rights. And, ultimately, questions about Officer Knea's intent are more appropriately reserved for the jury. *See Cornell*, 17 Cal. App. 5th at 803 ("[T]he jury must make the [] factual[] determination[:] Did the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that . . . right?"); *see also Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022) ("Whether [the officer] used excessive force in violation of [the plaintiff's] constitutional right, and whether he had a specific intent to do so, are questions properly reserved for the trier of fact."). Because Defendants have not shown no reasonable juror would find Officer Knea acted with specific intent to violate Plaintiff's constitutional rights, the Court denies Defendants' motion for summary judgment on Plaintiff's Bane Act claim.

### D.    False Imprisonment

"The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000) (citation omitted). Defendants argue no reasonable juror could find Officer Knea intentionally confined Plaintiff in the water or otherwise prevented him from leaving the water. As Plaintiff does not respond to Defendants' arguments, the Court grants Defendants summary judgment on Plaintiff's false imprisonment claim.

## VI.    DOE DEFENDANTS

Defendants ask the Court to dismiss the Doe defendants because Plaintiff has not served them in the more than 90 days since filing his operative complaint on March 31, 2025. *See* Fed. R. Civ. P. 4(m) (requiring plaintiffs to serve all defendants within 90 days of filing complaint). Plaintiff does not oppose Defendants' request or show good cause. And "[g]enerally, 'Doe' pleading is improper in federal court . . . [as] [t]here is no provision in the Federal rules permitting the use of fictitious defendants." *Buckheit v. Dennis*, 713 F. Supp. 2d 910, 918 n.4 (N.D. Cal.

34

2010) (citing *Bogan v. Keene Corp.*, 852 F.2d 1238, 1239 (9th Cir. 1988); *Fifty Assocs. v. Prudential Ins. Co.*, 446 F.2d 1187, 1191 (9th Cir. 1970)).  So, the Court dismisses the Doe defendants.

**VII.    PUNITIVE DAMAGES**

Defendants also ask to dismiss Plaintiff's claims for punitive damages against both EBRPD and Officer Knea.  The Court agrees punitive damages are not available against EBRPD. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983."); Cal. Gov't Code § 818 ("[A] public entity is not liable for damages . . . imposed primarily for the sake of example and by way of punishing the defendant.").

However, punitive damages from Officer Knea may be available if Plaintiff can prove Officer Knea acted with more than negligent intent.  *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (allowing punitive damages in section 1983 claims "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"); Cal. Civ. Code § 3294(a) (allowing punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice").  The Court agrees with Plaintiff it is premature to rule on Officer Knea's intent—and therefore the availability punitive damages—at the summary judgment stage. *See Johnson v. Cnty. of San Bernadino*, No. EDCV 18-2523-GW-AFMx, 2020 WL 5224350, at *30 (C.D. Cal. June 24, 2020) ("[T]he Court is not inclined to take the question of punitive damages out of the factfinder's hands where there are still viable claims for, among other things, . . . excessive force."); *Atienza v. Hall*, No. 19-CV-03440-RS, 2021 WL 3409254, at *7 (N.D. Cal. Aug. 4, 2021) ("Though Officer Hall moves for summary judgment on Plaintiff's [] damage 'claims,' her request for . . . punitive damages are simply theories of recovery that cannot be substantively challenged at this stage.").

**CONCLUSION**

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's Fourteenth Amendment and false imprisonment claims, and as to

Plaintiff's claim Officer Knea's first and second taser discharges violated the Fourth Amendment. The Court otherwise DENIES Defendants' motion, including as to Plaintiff's claim Officer Knea's third, fourth, and fifth taser discharges violated the Fourth Amendment; Plaintiff's *Monell*, negligence, battery, and Bane Act claims; and Plaintiff's claim for punitive damages against Officer Knea. The Court also DISMISSES all Doe defendants, as well as claims for punitive damages against EBRPD.

This Order disposes of Docket No. 101.

**IT IS SO ORDERED.**

Dated: December 18, 2025

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

36