United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEONTAE CHARLES FAISON, et al.,

Plaintiffs,

v.

EAST BAY REGIONAL PARKS DISTRICT, et al.,

Defendants.

Case No. 3:24-cv-06059-JSC

**ORDER RE: *DAUBERT* MOTIONS TO EXCLUDE EXPERT OPINIONS**

Re: Dkt. Nos. 119, 142

Plaintiff sues the East Bay Regional Parks District ("EBRPD") and EBRPD Officer Jonathan Knea for violating his civil rights under federal and state laws. (Dkt. No. 52.)[1] Now pending before the Court are the parties' motions to exclude expert testimony at trial. (Dkt. Nos. 119, 142.) Having carefully considered the parties' submissions and with the benefit of oral argument on September 15, 2026, the Court GRANTS IN PART and DENIES IN PART Plaintiff's motion to exclude and GRANTS IN PART and DENIES IN PART Defendants' motion to exclude.

**LEGAL STANDARD**

Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if the following requirements are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

[1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

United States District Court
Northern District of California

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

Scientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003). The court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 595 (1993). The court's "task . . . is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (hereinafter *Daubert II*). The same "basic gatekeeping obligation applies. . . to all expert testimony," not just to scientific experts. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999).

In deciding whether to permit an expert to testify, courts face the difficult task of "determin[ing] whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert II*, 43 F.3d at 1317. Among the factors courts consider in making this determination are: (1) whether the expert's theory or method is generally accepted in the scientific community; (2) whether the expert's methodology can be or has been tested; (3) the known or potential error rate of the technique; and (4) whether the method has been subjected to peer review and publication. *Id.* at 1316 (citing *Daubert*, 509 U.S. at 593-94). Consideration should also be given to whether the expert's testimony springs from research independent of the litigation. *Id.* at 1317. If not, the expert should point to other indicia of reliability, such as peer-reviewed studies or a reputable source showing that the expert "followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1317-19. "These factors are illustrative, and they are not all applicable in each case." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1233

(9th Cir. 2017). The inquiry is "flexible," *Daubert*, 509 U.S. at 594, and "Rule 702 should be applied with a 'liberal thrust' favoring admission," *Messick*, 747 F.3d at 1196 (quoting *Daubert*, 509 U.S. at 588). The expert's proponent "has the burden of proving admissibility." *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

**DISCUSSION**

Plaintiff moves to exclude portions or the entirety of the testimony of five of Defendants' experts: Robert Fonzi, Dr. Binh Ly, Dr. Gary Vilke, Dr. Durand Begault, and Brian Chiles. (Dkt. No. 119.) Defendants move to exclude the testimony of one of Plaintiff's experts: Travis Norton. (Dkt. No 142.)

**A. Mr. Norton**

Plaintiff retained Mr. Travis Norton, a retired police officer with expertise in use of force and police procedures. (Dkt. No. 126-2 at 5.) Defendants seek to exclude portions of Mr. Norton's testimony for a lack of qualifications or for reaching into the province of the jury. (Dkt. No. 142 at 1-5.)

**1. Qualifications as an Expert on Taser Use**

Defendants argue Mr. Norton "lacks the knowledge, experience, training, or education" to testify on Officer Knea's Taser use. (Dkt. No. 142 at 3.) Specifically, Defendants identify Mr. Norton's limited training on Tasers and inexperience using Tasers near water. (*Id.* at 3-4.) However, Mr. Norton "was retained as a subject matter expert by Axon to review and critique the Taser 10" and "conducted several internal less lethal studies" involving Tasers. (Dkt. No. 126-2 at 5.) More generally, Mr. Norton's has an undisputed expertise in police practices and use of force, including "review[ing] hundreds of use of force incidents," (Dkt. No. 126-2 at 5), that can inform his assessment of a broad variety of police tools, including Tasers. *See Thomas v. Newton Intern. Enters.*, 42 F.3d 1266, 1270 n.3 (9th Cir. 1994) ("[N]on-scientific testimony need only be linked to some body of specialized knowledge or skills. [The challenged expert's] 29 years of experience provide that link."); *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. C 10–00544 JW, 2011 WL 5417090, at *4 (N.D. Cal. Oct. 27, 2011) ("The threshold for qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and experience

United States District Court
Northern District of California

suffices."); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 551 (C.D. Cal. 2014) ("Prior experience need not consist of prior expert witness testimony on the same issue."). For these reasons, Mr. Norton is qualified to testify to police practices on Taser use of force.

**2. Opinion Numbers 3 and 4**

Defendants seek to exclude Opinion No. 3 of Mr. Norton's report. (Dkt. No. 142 at 4.). In his third opinion, Mr. Norton writes "it is my opinion that a reasonable officer facing similar circumstances [as Officer Knea] would not believe that there is possibly a firearm involved without further evidence." (Dkt. No. 126-2 at 31.) Defendants argue this testimony is tantamount to "telling the jury in substance that Knea's testimony is not credible and should be rejected." (Dkt. No. 142 at 5.) Plaintiff replies that "even [Mr. Norton's] final conclusion that [Mr. Faison's] actions are *consistent* with being unarmed is not usurping the role of the jury." (Dkt. No. 142-1 at 6.)

Defendants also seek to exclude Opinion No. 4 of Mr. Norton's report. (Dkt. No. 142 at 4.). In his fourth opinion, Mr. Norton concludes "a reasonable officer facing similar circumstances would not have deployed a Taser at Mr. Faison as he was fleeing . . . ." (Dkt. No. 126-2 at 45.) Defendants argue Mr. Norton is "tell[ing] the jury how to decide the Constitutional claim" by crossing from "educat[ing] the jury" to "label[ing] the force 'appropriate' or 'inappropriate.'" (Dkt. No. 142 at 4.) Plaintiff counters that Mr. Norton merely "discussed and cited the relevant" training materials and professional standards. (Dkt. No. 142-1 at 5.)

In both instances, while Mr. Norton does recite the relevant professional standards and authorities, he goes too far in assessing the consistency of Officer Knea's behavior with those standards based on his interpretation of the available evidence. As one court explained:

> [The expert's] job as an expert witness is merely to aid the jury in comprehending the use-of-force standard for objectively reasonable officers. Given [the expert's] experience, he may also opine generally on matters falling within the scope of administrative reporting and review of use-of-force incidents (presuming relevance and foundation). But in each case, [the expert's] testimony . . . should not draw factual conclusions or speculate on the specifics of this particular case. In other words, [the expert] (like any other expert) should not decide for the jurors what happened in critical moments for which he was not present.

*Stevenson v. Holland*, 504 F. Supp. 3d 1107, 1120 (E.D. Cal. 2020). Thus, while Mr. Norton can answer hypotheticals about whether certain actions would conform with police standards, he cannot apply those standards to the specific incident at the heart of this lawsuit. *See Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (holding that expert witnesses in excessive force cases can comment on "alternative methods" available to police officers); *Valtierra v. City of Los Angeles*, 99 F. Supp. 3d 1190, 1199 (C.D. Cal. 2015) (concluding that an expert in police practices and tasers "could opine as to whether the officers' use of force was excessive or unreasonable" only "through hypothetical questioning so as to avoid invading the province of the jury"). Similarly, he can opine that based on his experience "[a] subject running with a concealed firearm typically holds his arms against the concealed weapon, either stiffly or with a very controlled swing," (Dkt. No. 126-2 at 37), but he cannot opine Officer Knea could not have reasonably believed Mr. Faison had a concealed weapon.

### 3. Deposition Topics

Defendants also seek to exclude various topics Mr. Norton discussed in his deposition as outside "the boundaries of his permitted opinions." (Dkt. No. 142 at 5.) Plaintiff "only intends to have his expert testify to the opinions within his report." (Dkt. No. 142-1 at 6.) Therefore, Mr. Norton must and will limit his testimony to the scope of his report.

## B. Mr. Fonzi

Mr. Robert Fonzi is a retired police officer with expertise in use of force and police procedures. (Dkt. No. 119-1 at 3.) Plaintiff moves to exclude the entirety of Mr. Fonzi's testimony on two grounds.

First, Plaintiff claims Mr. Fonzi's "six opinions are pure legal conclusions." (Dkt. No. 119 at 15.) Under Rule 704 of the Federal Rules of Evidence, expert testimony is "not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "That said, an expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). Rather, "such questions [about ultimate issues] should be posed to expert witnesses through hypothetical questions. 'Assuming this set of facts, might a reasonable officer conclude or do *X*?' Experts

cannot tell the jury, point blank, that a given defendant 'used excessive force' or 'acted unreasonably.'" *May v. San Mateo Cnty.*, No 16-cv-00252-LB, 2017 WL 2305160 at *9 (N.D. Cal. May 26, 2017). As Plaintiff emphasizes, this is especially true of body-worn camera footage. *See Villanueva-Galvez v. City of San Jose*, No. 24-cv-09055-VKD, 2026 WL 1612340, at *5 (N.D. Cal. June 4, 2026); *Johnson v. City of San Jose*, No. 21-cv-01849-BLF, 2023 WL 8852489, at *3 (N.D. Cal. Dec. 21, 2023).

Second, Plaintiff argues Mr. Fonzi's omission of "relevant police trainings that a jury should consider in evaluating the evidence" means his "opinions fail from a methodological standpoint." (Dkt. No. 119 at 16.) Without linking "general expertise" to specific conclusions by comparing them against applicable standards, a court cannot "sort out what reliable principles and methods underlie the particular conclusions offered." *United States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020) (citation omitted); *see also Villanueva-Galvez*, 2026 WL 1612340, at *4 (excluding an expert whose report did not tie "challenged opinions. . . to [] standards and practices").

Plaintiffs are correct on both points. First, Mr. Fonzi repeatedly frames his opinions as legal conclusions. (*See* Dkt. No. 119-1 at 5 ("reasonable suspicion"); *id.* at 7 ("probable cause"); *id.* at 9 ("reasonable force"); *id.* at 13 ("followed appropriate state law"); *id.* at 19 ("no evidence to support. . . .").) An "expert may not, however, opine on whether the defendants' use of force was reasonable under the circumstances because this is just such an opinion on an ultimate issue of law that risks usurping the jury's province." *Ochoa v. Cnty. of Kern*, 628 F. Supp. 3d 1006, 1018 (E.D. Cal. 2022) (cleaned up); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (concluding that if "an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's" (emphasis in original)); *Valiavicharska v. Celaya*, No. CV 10-4847 JSC, 2012 WL 13435103, at *3 (N.D. Cal. Jan. 24, 2012) ("An expert may not provide impermissible legal conclusions or make credibility determinations reserved for the trier of fact." (cleaned up)). Moreover, Mr. Fonzi provides no foundation for his opinions other than his impressions of the evidence and a conclusory reference to "Applicable P.O.S.T. training" and "Applicable policies

and procedures." (Dkt. No. 119-1 at 4.) That is insufficient. *See United States v. Tamman*, 782 F.3d 543, 552-53 (9th Cir. 2015) (holding expert testimony that "provided only a recitation of facts and the legal conclusion that [defendant] . . . did not break the law" was "not a proper expert opinion").

At oral argument, Defendants argued Mr. Fonzi had laid a proper foundation for his opinions by listing standards from the EBRPD police policy manual and asserting those standards to be "consistent with standard police practices." (*See* Dkt. No. 119-1 at 44-45.)[2] However, unlike Mr. Norton, Plaintiff's expert, Mr. Fonzi did not apply those standards when assessing the incident. (*Compare* Dkt. No. 119-1 at 9-13 (Mr. Fonzi's analysis of Officer Knea's Taser use) *with* Dkt. No. 126-2 at 45-53 (Mr. Norton's analysis of Officr Knea's Taser use). Rather, Mr. Fonzi repeatedly asserted his interpretation of the incident without more than a conclusory reference to police standards. *See, e.g.,* (Dkt. No. 119-1 at 13 ("Based on my review of the listed materials, it is my conclusion that a police officer acting consistently with standard police practices would conclude . . . .); *id.* at 19 ("Based on my review of the list materials, it is my opinion, determined by standard police practices . . . .). At no place does Mr. Fonzi describe which specific police standards would guide a law enforcement officer in Officer Knea's position and what alternatives police standards would or would not suggest. *See United States v. Jefferson*, No. 2:23-cr-00109-LK, 2025 WL 97378, at *5 (W.D. Wash. Jan. 12, 2025) (concluding an expert's "broad and sweeping pronouncements that his opinions follow generally accepted police practices amount to nothing more than his own *ipse dixit*").

With this backdrop, the Court addresses each of the opinions Mr. Fonzi proposes to offer in his testimony.

[2] At oral argument, Defendants handed the Court an appendix to Mr. Fonzi's report listing "Possible Force Option[s]" a law enforcement officer could deploy in different scenarios based on P.O.S.T. guidelines. This appendix does not appear in the filings nor, as far as the Court can tell, anywhere in the docket. To the contrary, in their opposition brief, Defendants rely on the version of Mr. Fonzi's report submitted by the Plaintiff and did not indicate any deficiencies in the filed version. (*See* Dkt. No. 126-1 at 2 ("Plaintiffs previously submitted the Rule 26 expert report of Robert Fonzi. . . Defendants do not submit duplicative copies of those materials with their opposition.").) Even if the additional materials had been properly filed, their generic recitation of use of force standards is insufficient foundation for Mr. Fonzi's expert conclusions.

**1. Opinions 1 and 2**

In his first opinion, Mr. Fonzi concludes there was "reasonable suspicion for Officer Knea to initiate contact" with Plaintiff. (Dkt. No. 119-1 at 5.) In his second opinion, Mr. Fonzi concludes "Officer Knea had probable cause to issue a citation to Deontae Faison" for a variety of infractions. (*Id.* at 7.) Both in their filings and at the hearing, Defendants agree these opinions are not at issue in this trial. (*See* Dkt. No 126 at 6 ("Defendants do not believe that these are issues for the jury to resolve.").) Therefore, both opinions are excluded as irrelevant.

**2. Opinions 3 and 4**

In his third opinion, Mr. Fonzi concludes "it is my opinion that a police officer acting consistently with standard police practices would conclude that Officer Knea, who encountered Faison, used both [sic] reasonable force applications, pursuant to California Penal Code section 835a." (Dkt. No. 119-1 at 9.) Defendants classify this section as Mr. Fonzi explaining "continuum of tactics reflected in the evidence" and "whether those tactics were consistent with police training." (Dkt. No. 126 at 7.) In the entire section of the opinion, however, the only reference to specific police standards comes in providing an explanation for why Officer Knea and his partner did not immediately notify their department that a Taser had been deployed. (*See* Dkt. No. 119-1 at 10.) For the remainder of the opinion, Mr. Fonzi purports to tell the jury what the facts of the case are. (*See, e.g. id.* at 9 ("The TASER appeared to have little to no effect as Faison stumbled into the waters . . . ."); *id.* at 10 ("It's important to note that this was an active incident with an active threat . . . ."); *id.* at 10 ("It was clear to the officers that the Taser was not effective. . . ."); *id.* at 12 ("Deontae Faison's deliberate acts of resisting contributed to the escalation of the incident. . . .").) In defending this opinion, Defendants cite to *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044 (9th Cir. 2024), where the court reasoned a police practices expert "could help a jury understand the options available to officers in similar situations to aid them in deciding whether the defendant officers' use of force was reasonable or excessive." *Hyer*, 118 F.4th at 1059. *Hyer* is inapposite because Mr. Fonzi walks through no options and outlines no similar situations, but rather just retroactively blesses Defendants' actions. Therefore, Mr. Fonzi's third opinion is excluded.

Mr. Fonzi's fourth opinion fares even worse. In its entirety, the opinion reads:

> Based on my review of the listed materials, it is my opinion that a police officer acting consistently with standard police practices would conclude that the involved officers followed appropriate state law, department policies, and training as it relates to reasonable suspicion, probable cause, de-escalation, use of force, and the arrest of Faison.
>
> Public safety is paramount and ensuring that public parks are safe is essential in fulfilling this goal. It's been alleged that there is no evidence, nor does any video show that anyone was at the park at the time of this incident. The incident occurred during the early evening hours on a Friday in a public park where people often gather for recreation, walking, and other activities.

(Dkt. No. 119-1 at 13.) While Defendants "agree Fonzi should not testify that Knea 'followed the law,'" they also argue that, under this opinion, Mr. Fonzi can testify "about the training officers received" and "whether Officer Knea was consistent with that training." (Dkt. No. 126 at 7.) But Mr. Fonzi does not discuss any trainings in this opinion. Rather, this opinion crosses from "concerning an ultimate issue" into concerning a "*legal conclusion*, i.e., an opinion on an ultimate issue of law." *See Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1065 n.10 (9th Cir. 2002), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020). Therefore, Mr. Fonzi's fourth opinion is excluded.

**3. Opinion 5**

In his fifth opinion, Mr. Fonzi concludes "a police officer acting consistently with standard police practices would conclude that the involved officers engage in reasonable efforts to pull Faison from the water and later provide medical aid consistent with their training." (Dkt. No. 119-1 at 13.) Defendants agree this issue is no longer in the case and therefore "moot." (Dkt. No. 126 at 7.) Therefore, Mr. Fonzi's fifth opinion is excluded.

**4. Opinion 6**

In his sixth opinion, Mr Fonzi concludes "there appears to be no evidence to support a propensity for violence and/or a lack of proper police procedures or policies by [EBRPD] and/or any member thereof." (Dkt. No. 119-1 at 19.) Defendants argue Mr. Fonzi should be able to say if he found EBRPD policies deficient because "[t]hat is a police practices opinion, not a legal conclusion." (Dkt. No. 126 at 8.) However, while Defendants say Mr. Fonzi can "explain the

materials he reviewed, the professional standards against which he evaluated them, and why he found no deficiency," none of that analysis appears in his report. (*See id.*) Therefore, Mr. Fonzi's sixth opinion is excluded.

Because none of his testimony is admissible based on his Rule 26 report, Plaintiff's motion to exclude Mr. Fonzi as an expert is GRANTED.

**C. Dr. Vilke**

Defendants retained Dr. Gary Vilke, a retired emergency room physician, as an expert on whether the Taser use contributed to Plaintiff's cardiac arrest. (Dkt. No. 119-3 at 2.) Plaintiff seeks to exclude portions of Dr. Vilke's testimony relating to three of the opinions in his report.

**1. Taser Probe Marks**

Plaintiff argues "Dr. Vilke lacks both the qualifications and the methodology to opine that he could not identify any taser probe marks on Plaintiff's back post-incident" and seeks to exclude Opinion No. 2. (Dkt. No. 119 at 19.) Plaintiff specifically contends Dr. Vilke's experience with Taser marks "were all from prior taser models" such that "he has no idea how the taser 10 probe mark would look like" and that Dr. Vilke did not examine or see photographs of Plaintiff's entire back, limiting what conclusions he could draw. (*Id.*) In his deposition, when asked about the number of Taser 10 markings he had seen, Dr. Vilke responded:

> I never really know what model is being used from that perspective. I've certainly seen lots of wounds, but I couldn't tell you, because usually I just get a probe, it's already been cut off in there. So it's possible I've seen some, it's possible I haven't really seen any.

(Dkt. No. 119-2 at 45.) And when asked about what distinguishes the Taser 10 from previous models, Dr. Vilke replied "It is different, yes. It creates less of a signature mark. It can create a little bruising. It does make a puncture wound." (*Id.* at 44.) Dr. Vilke also has also "been involved with over 200 TASER activations and ha[s] personally received multiple applications of the device." (Dkt. No. 119-3 at 19.) These answers indicate Dr. Vilke has both experience with a wide variety of Taser probes and recognizes what a Taser 10 probe looks like. *See Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991) ("A witness can qualify as an expert through practical experience in a particular field, not just through academic training.") This

constitutes "sufficient facts or data" for Dr. Vilke to reach his opinion, and Plaintiff raises no argument that using visual inspection is an unreliable "method" for a medical expert to reach conclusions about Taser markings. *See* FED. R. EVID. 702. To the extent Plaintiff questions the strength of the factual basis from which Dr. Vilke is drawing his conclusions, "it is up to the [Plaintiff] to examine the factual basis for the opinion in cross-examination." *Hangarter*, 373 F.3d at 1017 n. 14 (citation omitted); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). For these reasons, Dr. Vilke is qualified to identify Taser marks.

**2. Taser Activity**

Plaintiff seeks to exclude two claims Dr. Vilke makes about the Taser's activity. (Dkt. No. 119 at 19-20.) First, in Dr. Vilke's deposition, he discussed why the Taser probes might have made a connection even if they did not penetrate Plaintiff's skin. (Dkt. No. 119-2 at 38.) Plaintiff argues this is outside his expertise. (*See* Dkt. No. 119 at 20.) Defendants agree "electrical data falls outside [Dr. Vilke's] expertise" and that "Dr. Vilke does not purport to interpret the Taser's raw electrical data." (Dkt. No. 126.) Nor does Dr. Vilke address theories for the Taser probes making a connection in his report. (*See* Dkt. No. 119-3). Therefore, because the parties agree this is outside Dr. Vilke's expert qualifications, he cannot testify on this topic.

Plaintiff also objects to Dr. Vilke's conclusion within Opinion No. 1 that "[o]f the five TASER trigger pulls, video demonstrates that none of the discharges achieved the desired neuromuscular incapacitation (NMI)." (Dkt. No. 119-3 at 11.) Plaintiff argues Dr. Vilke "did not explain how he reached this opinion, [and] the methodology or analysis he relied on." (Dkt. No. 119 at 20.) Defendants respond that "viewing the video" provided the basis for Dr. Vilke's belief that Plaintiff experienced no NMI. (*See* Dkt. No. 126 at 9.) The Court agrees Dr. Vilke does not provide an adequate foundation for this conclusion. While Dr. Vilke can explain what symptoms are indicative of NMI, he cannot testify Plaintiff did not experience NMI.

**D. Dr. Ly**

Dr. Binh Ly is an active physician specializing in emergency medicine and medical

toxicology. (Dkt. No. 119-5 at 2.) Defendants retained Dr. Ly to "offer opinions regarding toxicological aspects that may have caused or contributed to the incident" giving rise to this lawsuit. (*Id.*)

Plaintiff moves to exclude portions of Opinion No. 5 and the entirety of Opinions Nos. 1, 5, 7, 9, 10, and 11. (Dkt. No. 119 at 6.) Plaintiff argues Dr. Ly is "offer[ing] opinions that speculate into the mindset of the Plaintiff about his motivation, causation or intentions for fleeing police or running into the water." (Dkt. No. 119 at 18.) Defendants reply the challenged statements are permissible as Dr. Ly "considered whether the behavior depicted in that footage was consistent with the known psychological and physiological effects of methamphetamine." (Dkt. No. 126 at 11.)

Experts are meant to assist, not supplant, the jury in interpreting the evidence. *See Stevenson*, 504 F.Supp.3d at 1119 ("[T]he trier of fact must do the necessary fact-finding at trial."). So while Dr. Ly can testify to the "psychological and physiological effects" common among users of methamphetamine, he cannot testify that Plaintiff's behavior was "consistent with" those effects. Rather, that determination is the province of the jury. Defendants can also ask whether, in Dr. Ly's expert opinion, a hypothetical symptom or action is indicative of methamphetamine use. *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) ("[T]he use of leading, hypothetical questions to elicit expert opinions is entirely appropriate."); *Stevenson*, 504 F.Supp.3d at 1119 ("To prevent invasion of the jury's province here, the Court will require the parties to use hypothetical questioning to explore [the expert's] testimony, conclusions, and opinions at trial."). Therefore, the following opinions are excluded:

- Opinions 1, 7, 10, and 11 in their entirety. (Dkt. No. 119-5 at 5, 7-8)
- The last sentence of Opinion 5. (Dkt. No. 119-5 at 7 ("Mr. Faison may have been misperceiving reality leading him to be noncompliant with the instructions of Ofc. Knea and fleeing the scene.").)
- All of Opinion 9 other than the sentence "Glass pipes are commonly used to smoke illicit drugs including methamphetamine." (Dkt. No. 119-5 at 8.).

United States District Court
Northern District of California

**E. Cumulativeness of Dr. Vilke and Dr. Ly**

Plaintiff claims Dr. Vilke's opinion on the cause of Plaintiff's cardiac arrest, Opinion No. 5, is "duplicative" of the opinion offered by Dr. Ly and therefore violative of Federal Rule of Evidence 403's admonishment against cumulative evidence. (*See* Dkt. No. 119 at 17.)

Federal Rule of Evidence 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. But "courts frequently permit multiple experts to opine on similar issues where each expert's credentials and expertise differ" so that "the mere presence of overlap, reference to another expert's report, or a similar conclusion, does not render an expert report unnecessarily cumulative." *Chavez-Herrera v. Shamrock Foods Co.*, No. 2:19-cv-01327-GMN-BNW, 2024 WL 111732, at *3 (D. Nev. Jan. 9, 2024) (citation omitted). In that vein, Defendants argue while "[t]here will necessarily be some overlap because both physicians address the same cardiac arrest," the opinions are not cumulative because Dr. Vilke focuses on the Taser's impact whereas Dr. Ly focuses on Plaintiff's toxicology. (Dkt. No. 126 at 9-10.) The Court agrees. While Plaintiff is correct both experts are "emergency medicine experts," (Dkt. No 119 at 17), Dr. Vilke is a researcher on "TASER electronic control devices," (Dkt. No. 119-3 at 2), whereas Dr. Ly is a "staff medical toxicologist." (Dkt. No. 119-5 at 2.) Therefore, the experts are sufficiently non-cumulative. Plaintiff can, of course, object at trial should the expert testimony become unnecessarily duplicative.

Plaintiff's cited cases to the contrary are not persuasive. In *Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir. 1998), the court excluded a pathologist who, like another pathologist, had identified there was a foreign body in the sample but, unlike the other pathologist, had failed to test what the foreign body was. *Id.* at 1421. The Ninth Circuit upheld the district court's exclusion of the expert "because [the testimony's] probative value was outweighed by the waste of time that would be involved." *Id.* at 1422. So, *Cabrera* is inapposite to the differing methods and sources used by Drs. Vilke and Ly. *United States v. Marabelles*, 724 F.2d 1374 (9th Cir. 1984) lends even less support. There, the Ninth Circuit "conclude[d] that there probably was some

probative value in the [excluded] testimony" but found "[t]he exclusion of relevant, but cumulative evidence is within the sound exercise of the trial court's discretion." *Id.* at 1382. If anything, the *Marabelles* court seemed to encourage the inclusion of potentially relevant testimony. *See id.*

**F. Dr. Begault**

Dr. Begault is Defendants' forensic video and audio expert. (Dkt. No. 119-8 at 3.) Plaintiff does not contest Dr. Begault's qualifications. (Dkt. No. 119 at 21.) Rather, Plaintiff argues Dr. Begault's description of Plaintiff as "swimming" is a "material fact dispute" and should be excluded from his testimony. (*Id.*) Defendants reply that Plaintiff's own expert, Dr. Schreiber described Plaintiff as "swimming" and "[t]here is therefore no genuine dispute over the characterization Plaintiffs [sic] now ask the Court to exclude." (Dkt. No. 126 at 12.) However, as discussed at the hearing, Mr. Begault "is an audio visual expert who will testify to the video he created." (Dkt. No. 134 at 33.) While Mr. Begault will presumably authenticate the video footage and explain any changes made to the raw footage, he need not comment on the contents of the videos he produced. Accordingly, Plaintiff's motion to exclude portions of Dr. Begault's testimony is GRANTED.

**G. Mr. Chiles**

Brian Chiles is a senior manager of Axon Forensics who "provid[es] forensic analysis for customers on TASER weapons" and other Axon products. (Dkt. No. 119-7 at 21.) The day after the incident, and long before this lawsuit was filed, EBRPD asked Axon for a report on the Taser use and provided Chiles the raw Taser data and video evidence to perform his analysis. Chiles completed his report on September 11, 2024. (Dkt. No. 126-4 at 2.) He was not compensated for doing the analysis; it is part of his job for Axon—"it was a customer service thing for the East Bay Police Department," (Dkt. No. 199-7 at 11), although sometimes his employer does charge for reports, not this time. (*Id.*)

**1. Retained versus Unretained**

Plaintiff argues Chiles is a retained expert and so Defendants had to comply with Federal Rules of Civil Procedure 26(a)(2)(B), which requires the expert prepare a written report

containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

FED. R. CIV. P. 26(a)(2)(B). While Defendants produced Mr. Chiles' report two years ago, the report does not satisfy requirements (iv) through (vi). Plaintiff thus seeks exclusion of Mr. Chiles' testimony in its entirety. (*See* Dkt. No. 119 at 23.)

Plaintiff relies on *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817 (9th Cir. 2011), to support the argument Mr. Chiles is a retained expert subject to Rule 26(a)(2)(B). *Goodman* held "a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment." *Id.* at 826. So, if the opinions are formed after treatment, Rule 26(a)(2)(B) required disclosure of a report. *Id.*

Here, Mr. Chiles testified he was not retained and is not being compensated for the work he did and he does not receive supplementary pay for writing reports or appearing for depositions. (Dkt. No. 119-7 at 10-12.) But, he also testified he has testified in connection with approximately 70 cases, and that sometimes he is specifically retained by an attorney to offer an opinion and testify. (Dkt. No. 119-7 at 8-9.) And Defendants offer no explanation as to why he can be retained sometimes and not others. The bottom line is he developed his opinion after the incident and based on data Defendants provided him. So, he should be treated as a retained expert. *See Montera v. Premier Nutrition Corp.*, No. 16-cv-06980-RS, 2022 WL 1225031, at *12 (N.D. Cal. Apr. 26, 2022) ("The critical distinction between retained and non-retained experts is the nature of the testimony the expert will provide, and whether it is based only on percipient knowledge or on

United States District Court
Northern District of California

information reviewed in anticipation of trial." (cleaned up)).

Plaintiff therefore contends his testimony should "automatic[ally]" be excluded in its entirety pursuant to Federal Rule of Civil Procedure 37(c)(1). (Dkt. No. 119 at 22.) The Court disagrees. Defendants provided Plaintiff with Mr. Chiles' report long before expert discovery even opened. While the report did not include the list of cases, his cv, or his compensation, Plaintiff deposed Mr. Chiles on his report, on his experience, and on other cases in which he had testified. (Dkt. No. 119-7). And, when at the deposition Mr. Chiles refused to answer what Axon pays him, Plaintiff moved to compel his response, which the Court granted. (*See* Dkt. No. 100 at 2-3 (Plaintiff's motion); Dkt. No. 109 at 10, 15-16 (Court's order)). But Plaintiff never moved to compel Mr. Chiles' cv or list of cases if he thought he needed them.

The cases upon which Plaintiff relies are distinguishable. In *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101 (9th Cir. 2001), the defendant did not produce the expert's report until almost two years after the close of discovery and one month before trial; in other words, it involved the wholesale failure to disclose an expert. *Id.* at 1105-06. And in *Merch. v. Corizon Health, Inc*., 993 F.3d 733 (9th Cir. 2021), the litigant "persistently disregarded Rule 26(a)(2) throughout the course of discovery," including disclosing evidence months after the deadline. *Id.* at 739. Here, in contrast, given Mr. Chiles' report was disclosed, Plaintiff deposed Mr. Chiles, and Plaintiff never asked for the cv or list of previous cases despite asking for compensation information, the failure to include Mr. Chiles' cv, list of publications, and list of cases was harmless. So, the Court declines to exclude Mr. Chiles' testimony. *See* FED. R. CIV. P. 37(c)(1) (not requiring exclusion when the failure to disclose or supplement a Rule 26 report was "harmless").

But, as discussed at the hearing, Defendants shall provide Plaintiff with Mr. Chiles' cv, list of publications, and list of past cases. Defendants shall do so by September 23, 2026.

**B. Reliability**

**1. Water Conductivity**

Plaintiff also seeks to exclude Mr. Chiles' testimony "that the taser activation occurred because the electrical current must have traveled the through the estuary water rather than

Plaintiff's body." (Dkt. No. 119 at 23; *see also* Dkt. No. 126-4 at 2, 6-7.) Defendants respond that Mr. Chiles "interprets [Taser] data using his specialized knowledge and experience with that device" and that his interpretations about impedance (i.e., when the Taser is impeded from electrical connection) in water are reliable. (Dkt. No. 126 at 16.) However, while Mr. Chiles is qualified to testify to what data from a Taser indicates, he is not qualified in what conditions do or not produce a given data readout. (*See* Dkt. No. 119-7 at 62 ("I'm not an expert in water conductivity."); *id.* at 110 (stating he would not know what electrical current would appear when a probe conducts though water "unless [he] tested that water").) This is underscored by conflicting claims about causation within Mr. Chiles' report. (*Compare* 126-4 at 6 (concluding the data was "consistent with discharging into muscles [sic] tissue or another conducive material . . . . [but also] the electricity conduction could have through the water as well") *with id.* at 7 ("[T]he charge that was delivered could have been *only* into the conducive water." (emphasis added)).) So while Mr. Chiles can testify to what the raw Taser data indicates, such as connection time or electrical current, Defendants have not laid a foundation that Mr. Chiles is qualified to say what caused the data to be generated during the incident.

**2. Length of Taser Probes' Electrical Connection**

Finally, Plaintiff seeks to exclude Mr. Chiles' opinion "that of the five probe deployments only the fifth one completed a correct circuit for NMI but it lasted just 0.25 seconds." (Dkt. No. 119 at 24.) Plaintiff makes two specific points in support of this argument. First, Plaintiff argues Mr. Chiles cannot reliably testify to how a Taser "reacts to a subject being tased while they are in the water." (*Id.*) However, Defendants are correct that "Chiles is qualified to explain data generated by technology he analyzes professionally." (Dkt. No. 126 at 6.) To the extent that water confounds normal readings of a Taser, Plaintiff is free to cross-examine Mr. Chiles on the limits of his knowledge.

Second, Plaintiff argues that Mr. Chiles inability to "reconcil[e]" a long beep from the Taser, which indicates a connection, during the incident with his conclusion that the connection lasted only 0.25 seconds. (Dkt. No. 119 at 25.) However, in his deposition, Mr. Chiles stated that the discrepancy was caused by a software issue with the weapon that was later corrected. (Dkt.

No. 119-7 at 94-95.) Therefore, Plaintiff's characterization of Mr. Chiles offer[ing] no. . . explanation" and "simply accepting the .25-second electronic reading" is incorrect. (*See* Dkt. No. 119 at 25.) While these discrepancies may go to the credibility of Mr. Chiles' expert opinions, they do not go to the reliability of his experience or methodology.

Accordingly, Mr. Chiles can testify on the length of electrical conduction indicated in the Taser data.

**CONCLUSION**

This Order disposes of Docket Nos. 119, 142.

**IT IS SO ORDERED.**

Dated: September 17, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California